John W. TORGERSON, Plaintiff-Respondent-Petitioner,

v.

JOURNAL/SENTINEL, INC., Defendant-Appellant. [Case No. 95–1098]

John W. TORGERSON, Plaintiff-Appellant-Petitioner,

v.

JOURNAL/SENTINEL, INC., Defendant-Respondent. [Case No. 95–1857]

Supreme Court

*Nos. 95–1098, 95–1857. Oral argument March 5, 1997.—Decided June 11, 1997.*

(Also reported in 563 N.W.2d 472.)

526

For plaintiff-respondent/appellant-petitioner there were briefs by *Brian E. Butler, Meg Vergeront* and *Stafford, Rosenbaum, Rieser & Hansen,* Madison and oral argument by *Brian E. Butler.*

For the defendant-appellant/respondent there was a brief by *Robert J. Dreps, Brady C. Williamson* and *La Follette & Sinykin,* Madison and oral argument by *Robert J. Dreps.*

¶ 1. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE. This is a review of an unpublished decision of the court of appeals,[1] affirming in part and reversing in part a judgment and order of the Circuit Court for Eau Claire County, Paul J. Lenz, Judge. The circuit court denied the motion for summary judgment of Journal/Sentinel, Inc. (the newspaper) in the first defamation action of John W. Torgerson (the plaintiff) and, in a separate proceeding, granted the newspaper's motion to dismiss the plaintiff's second action, which alleged defamation in other papers' republications of the originally challenged article.[2]

---

[1] *Torgerson v. Journal/Sentinel Inc.*, Nos. 95–1098 and 95–1857, unpublished slip op. (Wis. Ct. App. Feb. 13, 1996).

[2] In the second action, the circuit court held that the plaintiff failed to comply with Wis. Stat. § 895.05(2) (1995–96), the libel action retraction notice provision, in regard to the republications because § 895.05(2) required a plaintiff in a libel action to give a retraction notice for all related publications for which it sought relief prior to filing a claim based on any of the publications.

The plaintiff sought review of the circuit court's construction of the retraction notice statute. Because we conclude, as did the court of appeals, that the plaintiff's republication action fails for the same reasons as does his first action, we do not

¶ 2. The court of appeals granted the newspaper leave to appeal the circuit court's denial of the newspaper's motion for a summary judgment in the first action, and the plaintiff appealed the circuit court's grant of the newspaper's motion to dismiss the second action. The court of appeals consolidated the appeals. It concluded that the plaintiff failed to provide sufficient evidence of actual malice to go to trial, reversing the circuit court's denial of the newspaper's motion for summary judgment in the first action and affirming, on other grounds, the circuit court's dismissal of the second action.

¶ 3. The newspaper urges several grounds on which it is entitled to summary judgment: the articles are protected by a common law fair comment privilege, the articles make no actionable statements, the articles are not false and the articles were not published with actual malice. The plaintiff disputes each of these grounds.

¶ 4. We conclude, as did the court of appeals, that the motion for summary judgment must be granted because, as a matter of law, there was not sufficient evidence of actual malice. Were the fact finder to accept the plaintiff's version of the facts, it could not conclude that the newspaper had published with actual malice, that is, with knowledge of falsity or with reckless disregard for the truth in making the assertions in question. We therefore affirm the decision of the court of appeals.

¶ 5. We will discuss in turn: (1) the factual basis of the action; (2) the elements of a defamation action brought by a public figure against a media defendant; (3) the standard of appellate review and the appropri-

reach this issue. Hereafter we do not distinguish the two actions.

528

ate summary judgment methodology in a public figure defamation action; and (4) the element of actual malice.

## I.

¶ 6. The following recitation of facts is drawn from the extensive depositions and exhibits supporting the motion for, and brief opposing, summary judgment.

¶ 7. The plaintiff served as Wisconsin's Deputy Commissioner of Insurance from January 1991 until December 1992 and then as acting Commissioner through March 1993. While serving in the Office of Commissioner of Insurance (OCI), the plaintiff held a 50% ownership interest in and was secretary-treasurer of a title insurance agency regulated by the OCI.

¶ 8. In April 1991, at the plaintiff's request, Jonathan Becker, legal counsel for the State of Wisconsin Ethics Board, wrote a letter advising the plaintiff of conflicts of interest that might arise because of his concurrent business and government positions, and how to avoid them. The letter summarized the relevant statutes and opinions of the Ethics Board. It opined that the plaintiff's ownership of and employment by a title insurer "raise[d] issues under the Ethics Code," but that "the Ethics Code 'does not prevent any state public official from accepting other employment or following any pursuit which in no way interferes with the full and faithful discharge of his or her duties to the state.'"[3] R. 21 at 10–11. Becker's letter provided further advice and guidance for a public official to avoid situations of potential conflict as follows:

> [T]he Ethics Board has recognized that if a state public official has a sizable investment in a business

---

[3] The Code of Ethics for Public Officials and Employes is set forth at Wis. Stat. ch. 19, subch. III (1995–96).

that the official's agency regulates, the official's personal interest in the performance of that business may conflict impermissibly with the official's regulatory responsibilities.

A public officer owes an undivided duty to the public whom he serves and should avoid placing himself in a position in which a conflict of interest might arise.. . .Thus, in determining when and how to avoid situations of potential conflict I advise erring on the side of caution.

R. 21 at 11 (citations omitted).

¶ 9. Becker's letter offered three additional pieces of guidance. First, it stated that, "at a minimum, it would be inappropriate for you to place yourself in a position in which you or your business would benefit directly from a decision or action you took specifically in respect to your business"; second, "you should refrain from similar action involving the business of any competitors;" third, with regard to rule making, the plaintiff should be guided as follows:

[I]n instances in which your agency is called upon to promulgate rules. . .you should participate only if: (1) your action affects the whole class of similarly situated businesses; (2) your business's presence in the class is insignificant when compared to the total number of members in the class; and (3) the action's effect on your business is neither significantly greater nor less than upon other members of the class.

R. 21 at 11.

¶ 10. Early in 1992 an acquaintance of the plaintiff in the title insurance industry suggested to the plaintiff that the OCI amend an administrative rule so that title insurance companies would be exempt from

filing reports of discounted title insurance rates with the OCI. The plaintiff asked OCI staff members to draft such a rule change if they found it advisable, good public policy and good for the agency. The amended rule was drafted and, in January 1993, approved by the plaintiff.

¶ 11. Also in January 1993 the Ethics Board provided a second letter advisory opinion at the plaintiff's request. The second letter, written by Ethics Board Executive Director R. Roth Judd, reaffirmed the January 1991 advice. Judd's letter characterized the 1991 letter as follows:

> [W]e noted that state law would forbid you to use your position as deputy to obtain a substantial benefit for the title insurance company or to participate in matters in which you have a substantial financial interest. After noting that "a public officer owes an undivided loyalty to the public whom it serves and should avoid placing himself in a position in which a conflict of interest might arise," we advised erring on the side of caution.

R. 21 at 15. Judd's letter then repeated the three pieces of guidance given in the 1991 letter.[4]

¶ 12. Later in January 1993 the newspaper published three related articles by staff writer James Rowen discussing the plaintiff's title insurance business and regulatory position and the Ethics Board

---

[4] Judd also opined that the statute relating to eligibility for office prevented the plaintiff from serving as Commissioner of Insurance while retaining his financial interest and remaining active in a title insurance company.

letters.[5] The articles do not mention the rule change. The plaintiff does not claim that these articles were defamatory.

¶ 13. In October 1993 the newspaper published another article by Rowen discussing the plaintiff's concurrent business and government positions and the Ethics Board letters in the context of the rule change.[6] Under the headline "Torgerson cut rule despite ethics warning," the article stated that the plaintiff's concurrent positions had led "to two warnings by the state Ethics Board to avoid a conflict of interest by staying out of title insurance regulation," but that the plaintiff had helped to eliminate the discount rate filing rule.

¶ 14. The article discussed the effect of the rule change and reported the views of several persons, including the plaintiff and Becker. The article described Becker as "disappointed to learn that Torgerson had been involved in changing the rules governing title insurance regulation." Becker was quoted as follows: " 'Quite honestly, I'm just very surprised given what he said publicly and privately to us that he was uninvolved.' " Becker was also reported as saying that the "Ethics Board advice was meant to suggest caution in potential conflicts of interest because state laws did not absolutely prohibit officials from acting on matters in which they have personal interests."

¶ 15. The article reported the plaintiff's position as follows:

---

[5] Two articles appeared before the second Ethics Board letter was written; only the third article discussed the second Ethics Board letter.

[6] The newspaper published articles on October 14 and October 15. The two articles are substantially the same and we consider them as one, as do the parties.

532

Torgerson told The Journal earlier this year, after it had disclosed his dual role as insurance regulator and insurance company co-owner, that he had stayed out of title insurance matters.

But he said in an interview Wednesday that he had initiated and approved the change in the rate filing rule because he thought it would cut the cost of writing policies and did not benefit him personally.

¶ 16. On November 3, 1993, counsel for the plaintiff wrote to the newspaper, pursuant to Wis. Stat. § 895.05(2) (1991–92), claiming that the October article was false and defamatory and asking the newspaper to print a retraction. The newspaper did not do so.

¶ 17. Rowen was informed of the request for retraction and understood its significance as a possible prelude to a defamation lawsuit. Rowen had also been informed by a reporter for another newspaper that the plaintiff intended to sue Rowen for defamation. Nonetheless, Rowen destroyed documents related to his investigation of the plaintiff and the title insurance industry, including his notes from interviews with Becker and others.[7] A few months later the plaintiff commenced this action.

¶ 18. The plaintiff asserts that the article was defamatory, falsely charging him with acting contrary to "warnings" issued by the Ethics Board about the ethics of his conduct and falsely implying that he had

---

[7] Because this case is before us on review of a circuit court's decision on a motion for summary judgment, we adopt the plaintiff's characterization, "destroyed," rather than the newspaper's term, "discarded." Rowen testified on deposition that he had been assigned to a new office and his filing space was drastically reduced and thus he discarded dozens of files of notes, relating to this and other articles, while retaining documents that would require expense to reacquire.

abused his public position to advance his own business interests to the detriment of consumers of title insurance. The plaintiff further asserts that the article was published with knowledge of the falsehood or reckless disregard for the truth.

## II.

¶ 19. The sole issue under review is whether the plaintiff's action survives the newspaper's motion for summary judgment. We first examine the elements of a defamatory communication. In this case the action was brought by a public figure[8] against a media defendant.

> The elements of a defamatory communication are:
>
> (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and, (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Stoll v. Adriansen*, 122 Wis. 2d 503, 517, 362 N.W.2d 182 (Ct. App. 1984); Wis JI—Civil 2500 (1993).[9] If the challenged statements as a whole are not capable of a

---

[8] The parties do not dispute that the plaintiff's burden is the same whether he is considered a public figure or a public official. We use "public figure" because it is the more general term.

[9] More recent court of appeals decisions state, without discussion, four elements derived from Restatement (Second) of Torts § 558 (1977) (a false and defamatory statement; an unprivileged publication to a third party; fault amounting at least to negligence by the publisher; and either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication). *See, e.g., Bay View*

false and defamatory meaning, or are substantially true, a libel action will fail. *Meier v. Meurer*, 8 Wis. 2d 24, 29, 98 N.W.2d 411 (1959).

¶ 20. The parties agree that there was a communication to third persons and that the communication was unprivileged. The parties further agree, at least for purposes of this review, that defamatory implications might be drawn from the article. According to the plaintiff, the article implied that he had exploited his position of public trust for personal gain and that he had disregarded the advice he got, which the newspaper falsely characterized as Ethics Board "warnings" that he stay out of title insurance matters coming before the OCI.

¶ 21. Thus, with respect to the common law elements of defamation, the parties' disagreement focuses on the issue of falsity, which is related to the question of actual malice. Where the defamation plaintiff is a public figure, the First and Fourteenth Amendments to the federal Constitution mandate that the plaintiff prove actual malice by clear and convincing evidence.[10]

¶ 22. The First Amendment imposes a constitutional privilege on the publication of statements about public figures, even when those statements are false and defamatory. The privilege, however, is conditional, and the condition is the absence of actual malice. The requirement that actual malice be proven is a minimal

*Packing Co. v. Taff*, 198 Wis. 2d 653, 673, 543 N.W.2d 522 (Ct. App. 1995).

For present purposes the distinctions between the two sets of elements, if any, are unimportant.

[10] *Masson v. New Yorker Magazine, Inc.* 501 U.S. 496, 510 (1991) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).

535

accommodation of the reputational interests of public figures and the community's interest in unfettered public debate.[11]

¶ 23. Actual malice is a term of art; it is not used in its ordinary meaning of evil intent.[12] Proof of actual malice requires a showing that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard for its truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Falsity and malice are thus intertwined.

¶ 24. Because the parties disagree about whether the article was published with actual malice, actual malice is the focus of this review.

### III.

¶ 25. We turn now to the standard of appellate review of the denial of a motion for summary judgment and the appropriate summary judgment methodology in a public figure defamation action.

¶ 26. Appellate courts review a grant or denial of summary judgment independently of the circuit court or court of appeals, *Burkes v. Klauser*, 185 Wis. 2d 308, 327, 517 N.W.2d 503 (1994), applying the same methodology as the circuit court, *Grams v. Boss*, 97 Wis. 2d

[11] "Neither lies nor false communications serve the ends of the First Amendment and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

[12] *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666–67 and n.7 (1989).

332, 338–39, 294 N.W.2d 473 (1980). A party's motion for summary judgment shall be granted when the pleadings and supporting papers show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2) (1995–96). Justifiable inferences are drawn in favor of the nonmoving party. *Grams*, 97 Wis. 2d at 338–39. "Where facts, even if material, are disputed, those facts become irrelevant if, in giving full benefit to the party against whom summary judgment is sought, the claim nevertheless is barred as a matter of law." *Byrne v. Bercker*, 176 Wis. 2d 1037, 1045, 501 N.W.2d 402 (1993). The summary judgment materials are viewed most favorably to the nonmoving party, the plaintiff here.

■

¶ 27. The summary judgment analysis is further affected by First Amendment considerations. In *New York Times* the Supreme Court concluded that the First Amendment requires an appellate court to " 'make an independent examination of the whole record' so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times*, 376 U.S. at 285 (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)). In so doing, appellate judges must " 'examine for [them]selves the statements in issue and the circumstances under which they were made.' " *New York Times*, 376 U.S. at 285 (quoting *Pennekamp v. Florida*, 328 U.S. 331, 335 (1946). The rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984).

¶ 28. *New York Times* and *Bose* involved appeals after trial. In recent years debate has focused on how this rule of independent examination is to be applied by a court on a motion for summary judgment.[13]

¶ 29. Since *New York Times* summary judgment has played a key role in protecting First Amendment values. Indeed, it has been said that in public figure defamation cases, "because of the importance of free speech, summary judgment *is* the 'rule,' and not the exception." *Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042, 1053 (S.D.N.Y 1975), *aff'd mem.* 538 F.2d 309 (2d Cir. 1976).[14] The Wisconsin court of appeals

---

[13] For a colloquy discussing the meaning of independent appellate review and the application of *Bose*, see the majority opinion of Judges Starr and Wright and the concurrence of Judge Wald in *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir.) (en banc), *cert. denied*, 484 U.S. 870 (1987).

[14] *See* Bruce W. Sanford, *Libel and Privacy*, 653 n.158, § 13.3 (1996–1 Supp.) (collecting cases supporting the proposition that "summary judgment is the preferred way to dispose of libel actions"); Rodney A. Smolla, *Law of Defamation*, § 12.07[3][a](11/96) at p. 12–38.7 (declaring that "the actual malice standard is sufficiently difficult to meet to make summary judgment in favor of the defendants relatively common in public figure cases simply as a matter of substantive law").

*See also Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1011 (1967). Although recognizing that "the right to a trial by jury is at stake," Judge Wright stated:

> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the *Times* principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. The threat of being put to the defense of a lawsuit brought by a popular public official may be as

has said that "[s]ummary judgment may be particularly appropriate in defamation actions in order to mitigate the potential 'chilling effect' on free speech and the press that might result from lengthy and expensive litigation." *Bay View Packing Co. v. Taff*, 198 Wis. 2d 653, 672, 543 N.W.2d 522 (Ct. App. 1995) (citing *Time, Inc. v. Hill*, 385 U.S. 374, 401–02 (1967) (Douglas, J., concurring)).

¶ 30. On the other hand, courts have found public figure defamation actions to be ill suited to summary judgment. Because the actual malice inquiry, the heart of the constitutional privilege which courts must guard, turns on the defendant's state of mind, it is thought particularly difficult to resolve without a full weighing of the competing evidence.[15]

¶ 31. We conclude that because courts have a duty to review the record independently in public fig-

_____

chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, especially to advocates of unpopular causes.

[15] The United States Supreme Court, without ruling on the matter, stated this concern in *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) (proof of actual malice "does not readily lend itself to summary disposition").

The Court has clarified that the *Hutchinson* statement "was simply an acknowledgment of our general reluctance 'to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 n.7 (1986) (quoting *Calder v. Jones*, 465 U.S. 783, 790–91 (1984).

*See Yiamouyiannis v. Consumers Union of U.S., Inc.*, 619 F.2d 932, 939–40 (2d Cir.) *cert. denied*, 449 U.S. 839 (1980) (discussing evolution of courts' views on the proper use of summary judgment).

ure libel actions and this duty entails a "constitutional responsibility that cannot be delegated to the trier of fact," *Bose*, 466 U.S. at 501, summary judgment is an important and favored method for adjudicating public figure defamation actions.

¶ 32. A final question then is whether and how the heightened evidentiary burden of proof of actual malice, proof by clear and convincing evidence, is to be incorporated in the summary judgment analysis. Although in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court addressed whether the heightened evidentiary burden for proof of actual malice must be incorporated in the summary judgment analysis, it is not clear what answer was given. The Court mandated application of the heightened evidentiary burden in the summary judgment analysis but did not clearly state whether it was required by the First Amendment or by Fed. R. Civ. P. 56(c), applicable to summary judgment motions in federal court actions. The Supreme Court held as follows:

> In sum, a court ruling on a motion for summary judgment must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.

*Anderson*, 477 U.S. at 257.[16]

---

[16] It is arguable that the *Anderson* court rested its holding not on the First Amendment but on Fed. R. Civ. P. 56(c) and on prior cases interpreting federal summary judgment methodology generally. Thus, one dissenting opinion stated at the outset: "The Court's holding today is not, of course, confined in its application to First Amendment cases. . .It changes summary

540

¶ 33. We need not decide whether the evidentiary burden for actual malice applies in the summary judgment analysis, and if so whether it is mandated by the First Amendment or by the state summary judgment law. The parties agree with the court of appeals that to survive a motion for summary judgment, a plaintiff in a public figure defamation action must present sufficient evidence for a court to conclude that a reasonable jury could find actual malice by clear and convincing evidence.[17] Therefore the parties did not brief this issue. Accordingly, for purposes of this review

judgment procedure for all litigants, regardless of the substantive nature of the underlying litigation." *Anderson*, 477 U.S. at 257 n.1 (Brennan, J., dissenting).

State courts have struggled to determine whether *Anderson* set out a constitutional mandate. Some courts have concluded that *Anderson* requires state courts ruling on summary judgment in public figure defamation cases to apply the clear and convincing evidentiary burden. *See, e.g., Janklow v. Viking Press*, 459 N.W.2d 415, 419 (S.D. 1990); *Ruebke v. Globe Communications Corp.*, 738 P.2d 1246, 1252 (Kan. 1987). In Wisconsin, two decisions of the court of appeals have, without analysis, applied *Anderson* as a constitutional mandate. *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 917, 447 N.W.2d 105 (Ct. App. 1989); *Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 76, 426 N.W.2d 43 (Ct. App. 1988).

Other courts have concluded that *Anderson* sets out a mandate of federal procedural law only. These courts have declined to adopt the *Anderson* approach as a matter of state law. *Moffatt v. Brown*, 751 P.2d 939, 942–44 (Alaska 1988); *Casso v. Brand*, 776 S.W.2d 551, 555–58 (Tex. 1989).

For a discussion of *Anderson* and the cases interpreting *Anderson*, see also Robert D. Sack & Sandra S. Baron, *Libel, Slander, and Related Problems* (2d ed. 1994) 791–92.

[17] *Anderson*, 477 U.S. at 255–56; *Yiamouyiannis*, 619 F.2d at 940.

and without deciding the correctness of the parties' position, we will incorporate the clear and convincing evidentiary burden in our summary judgment methodology. We further note, however, that the outcome would not be different under a traditional summary judgment analysis.

## IV.

¶ 34. The core of the dispute between the parties is the issue of actual malice. The plaintiff must present facts from which a reasonable jury could find, by clear and convincing evidence, that the newspaper published a false and defamatory statement with actual malice, that is, knowing the statement was false or with reckless disregard for its truth.

¶ 35. Actual malice is not determined by whether a reasonably prudent person would have published the challenged statements. The test is subjective. The complainant must show that the media defendant knew the statement was false, "in fact entertained serious doubts as to the truth" of the publication, *St. Amant*, 390 U.S. at 731, or had a high degree of awareness of probable falsity. *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). The media defendant, on the other hand, cannot prevail simply by proclaiming a belief in the truth of its publication. *St. Amant*, 390 U.S. at 732.

¶ 36. Some examples will help reveal the boundaries of actual malice. Mere failure to investigate adequately does not constitute actual malice. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 153–54 (1967) (opinion of Harlan, J.). Nor can actual malice be imputed from the mere fact that a published statement proves to be an erroneous interpretation of an ambiguous set of facts. *Time, Inc. v. Pape*, 401 U.S. 279, 290–92 (1971).

Actual malice may be shown by proof that the publisher had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

¶ 37. Falsity and actual malice are thus intertwined, and the plaintiff must prove falsity.[18] In this case, the plaintiff asserts that the newspaper published the following two false statements:[19] (1) the Ethics Board letters warned the plaintiff that he was absolutely prohibited from involvement in title insurance regulation,[20] and (2) the plaintiff had told Rowen

---

[18]*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986), held that the First Amendment requires a plaintiff in a private figure defamation case to bear the burden of proving falsity. We see no reason why a plaintiff in a public figure defamation case should not bear the same burden.

[19]The parties dispute whether the October article contained false statements or false implications.

We assume, without deciding, that a false and defamatory implication is actionable to the same extent as a false and defamatory statement. For a suggestion of heightened protections for implication, see David M. Cohn, Comment, *The Problem of Indirect Defamation: Omission of Material Facts, Implication, and Innuendo*, 1993 U. Chi. Legal F. 233. Hereafter we will refer to the statements and implications therefrom simply as statements.

[20]The plaintiff contends that the letters provided guidelines for avoiding conflicts of interest but did not indicate an absolute prohibition by warning him to stay out of title insurance matters.

The newspaper article provided several interpretations of the letters, including the plaintiff's own explanation that the letters simply admonished him to stay out of regulatory matters from which he could personally benefit and did not require him to totally disassociate himself from some general title insurance matters.

that he had stayed out of, and told Becker that he had been uninvolved with, title insurance regulation. We assume for purposes of our analysis that these statements are false.[21]

¶ 38. The plaintiff asserts two bases for inferring that the newspaper published these statements in the October article with actual malice. First, according to the plaintiff, Rowen's characterization of the Ethics Board letters in the January articles demonstrates that Rowen was aware when writing the October article that the letters did not constitute a warning to stay out of title insurance matters and that the plaintiff had not said that he had stayed out of title insurance matters.

¶ 39. Second, the plaintiff contends that Rowen's intentional destruction of the notes of his interview with Becker, while retaining other material collected for the articles, leads to an inference that the notes contained information probative of actual malice. We discuss each of these contentions in turn.

¶ 40. The January articles describe the Ethics Board letters in terms somewhat different from those employed in the October article. The January articles refer to the letters as setting forth "guidelines and limi-

---

The article also presented the views of Becker, the author of the principal Ethics Board letter, about the advice proffered. The article paraphrased Becker as stating that "Ethics Board advice was meant to suggest caution in potential conflicts of interest because state laws did not absolutely prohibit officials from acting on matters in which they have personal interests." Becker's views, as published, thus supported the plaintiff's interpretation quoted in the article.

[21] A statement is false if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson,* 501 U.S. at 517 (citations omitted).

tations" which would "limit [the plaintiff's] contact with the issuing of rules," rather than as containing "warnings" to "stay out" of title insurance matters. The tone of the January articles does not convey the sense that the plaintiff had been absolutely prohibited from involvement with title insurance matters.

¶ 41. Furthermore, the January articles paraphrase and quote the plaintiff concerning his involvement with title insurance regulation as follows:

> Torgerson said in an interview on Friday that the ethics guidelines were easy to follow because "the amount of effort that this agency expends on the title insurance industry is extremely limited."

> "There is an appearance of conflict which must be avoided." he said. "That appearance is extremely easy to avoid."

¶ 42. In the October article, the newspaper characterized the plaintiff as having told the newspaper[22] that "he had stayed out of title insurance matters."

¶ 43. The plaintiff thus contends that the January articles are probative of actual malice because they give context to Rowen's choice of words in the October article. We conclude, however, as did the court of appeals, that no inference of actual malice can be raised from Rowen's word choice in these circumstances even if the words chosen convey a provably false statement.

----

[22] The article reported that the plaintiff had told this to the newspaper after the newspaper had disclosed the plaintiff's dual role as insurance regulator and insurance company co-owner. It is not clear if the newspaper was relying on conversations with the plaintiff other than those relied on in the January articles. For purposes of summary judgment we assume not.

¶ 44. Rowen's October characterization of the Ethics Board's letters is a rational interpretation of ambiguous statements contained in those letters. Similarly, the characterization of the plaintiff's statement that he was staying out of title insurance regulation is a rational interpretation of the plaintiff's quoted, and undisputed, comments that he had avoided conflicts of interest in title insurance matters.

¶ 45. The United States Supreme Court has said that a court cannot infer actual malice sufficient to raise a jury issue from the deliberate choice of a rational interpretation of ambiguous materials. The article at issue in *Time, Inc. v. Pape*, 401 U.S. 279, concerned police lawlessness. The article quoted summaries of an unproven civil complaint described in a government report, without indicating either that the quotes came from a complaint or that the events described were as yet unproven. Noting that the government report, taken as a whole, "bristled with ambiguities," the Court held that under such circumstances the deliberate choice of one interpretation from a number of possible rational interpretations was not enough to create a jury issue of actual malice. *Time, Inc. v. Pape*, 401 U.S. at 289–90. The Court reasoned as follows: "Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of 'truth' that would not put the publisher virtually at the mercy of the unguided discretion of a jury." *Time, Inc. v. Pape*, 401 U.S. at 291.

¶ 46. Twenty years later, in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), the Court reaffirmed the importance of the holding in *Time, Inc. v. Pape*. "The protection for rational interpretation serves First Amendment principles by allowing the author the interpretive license that is necessary when

relying upon ambiguous sources." *Masson,* 501 U.S. at 519.

¶ 47. We agree with the court of appeals that "[t]he rationale underlying *Pape* resonates in the present lawsuit." *Torgerson v. Journal / Sentinel Inc.,* Nos. 95–1098 and 95–1857, unpublished slip op. at 12 (Wis. Ct. App. Feb. 13, 1996). The statements at issue in the letters from the Ethics Board are ambiguous. The letters urge caution, describe certain improprieties that must be avoided, urge the plaintiff to participate in rule making only if specific conditions prevail, and explain a statutory prohibition barring the plaintiff "from taking any official action" under certain circumstances. The newspaper's characterization of the letters as warnings to stay out of title insurance matters is one of several rational interpretations of the letters.

¶ 48. The newspaper's characterization of the plaintiff's statements is similarly a rational interpretation. The plaintiff's unchallenged statements reported in the January articles are reasonably capable of being interpreted as having "stayed out of" title insurance matters.

¶ 49. While evidence may demonstrate in some cases that a rational interpretation was nonetheless chosen with actual malice, this is not such a case. The distinctions between the January and October articles are not of such import that a reasonable jury could infer that Rowen published the October article knowing of its falsity or with reckless disregard for the truth. In sum, a fact finder is not entitled to draw an inference of actual malice from either the October article alone or in conjunction with the January articles.

¶ 50. The plaintiff's most significant evidence to support an allegation of actual malice is the inference of knowing falsity that might be drawn from Rowen's intentional destruction of the notes from his interview with Becker, while retaining other materials in the file. We agree with the plaintiff that a media defendant's intentional destruction of selected materials relevant to likely litigation is inherently suspicious, allowing an inference that the materials destroyed would have provided evidence of actual malice.

¶ 51. According to the plaintiff, the notes might have shown that the plaintiff had not told Becker that he was uninvolved with title insurance matters and that Becker might have given Rowen an interpretation of the Ethics Board letters different from that which Rowen ultimately put to paper. The plaintiff contends, therefore, that a fact finder may infer from the intentional destruction of the notes that they contained this information and that this inference must be drawn in the plaintiff's favor on summary judgment.

¶ 52. The court expresses its censure of the reporter's intentional destruction of materials potentially relevant to a threatened lawsuit. Indeed we are surprised that the newspaper allowed Rowen to retain possession of and to destroy materials potentially relevant to a threatened lawsuit. We agree with the plaintiff that the destruction of notes is ordinarily sufficient evidence to support a jury verdict of actual malice and will ordinarily defeat a news media defendant's motion for summary judgment.

¶ 53. Nevertheless, we conclude that the inferences the plaintiff urges cannot reasonably be drawn by a fact finder in this case: the notes were not relevant

to show an inconsistency between what Becker told Rowen and what Rowen reported.

¶ 54. We are guided to this conclusion by two cases in which the Seventh Circuit Court of Appeals addressed the question of the proper approach to note destruction as proof of actual malice.

¶ 55. In *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134–36 (7th Cir. 1987), *cert. denied*, 485 U.S. 993 (1988), the Seventh Circuit Court of Appeals recognized that an inference of actual malice could be drawn from the intentional destruction of a reporter's documents when the destruction was in bad faith. Bad faith was found on the following bases: the destruction took place between trial and an appeal; the documents were removed from a reporter's desk by a research assistant; the destruction was selective; the destruction violated the news company's retention policy; and the explanation for the destruction was not believable as a matter of law. On this "overwhelming" showing of bad faith, the court concluded: "A court and a jury are entitled to presume that documents destroyed in bad faith while litigation is pending would be unfavorable to the party that has destroyed the documents." *Brown & Williamson*, 827 F.2d at 1134.

¶ 56. In *Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085 (7th Cir. 1990), the Seventh Circuit Court of Appeals reviewed a grant of summary judgment where the complainant sought to raise an inference of actual malice from note destruction in circumstances similar to those of the present case. A television station broadcast a story suggesting that the complainant had planned to sell trade secrets to a competitor. The story relied heavily on an informant whom the reporter had interviewed, but the reporter's notes of her conversation with the informant had disap-

peared without explanation. The informant testified in deposition, however, that the story's characterization of the conversations was accurate. Given that all agreed on what was said, the Seventh Circuit Court of Appeals concluded that actual malice could not be inferred from the missing notes unless the reporter's notes included a statement of disbelief in the source's statements. The court pointed out that a reporter's writing about her disbelief in the truth of what she was reporting was so remote a possibility that it could not defeat a motion for summary judgment.[23] Under these circumstances the court held that the note destruction did not raise the inference of actual malice described in *Brown & Williamson*.

¶ 57. Viewed in the light most favorable to the plaintiff, the intentional and selective destruction of the notes in the present case shares some disturbing parallels with the facts in *Brown & Williamson*. Rowen destroyed interview notes but retained other documents; he destroyed the notes after learning that a defamation action was likely. Rowen, a veteran journalist, should have known that destroying notes which might be relevant to litigation was improper.

¶ 58. While we are troubled by the destruction of the notes, *Chang*, rather than *Brown & Williamson*, provides the more appropriate analogy for determining the significance of the note destruction in this case.

---

[23] The court reasoned as follows:

> Given the concord of the parties to these conversations on what was said, any inference from the missing notes could not supply clear and convincing evidence of malice unless [the reporter] wrote something like: "Tipster says X, but because I have not verified it I know X is untrue." Reporters do not write such notes to themselves.

*Chang v. Michiana Telecasting Corp.*, 900 F.2d 1085, 1090 (7th Cir. 1990).

¶ 59. The plaintiff contends that the interview notes might show that the plaintiff had not told Becker that he had been uninvolved in title insurance matters. Becker's deposition, however, affirms the accuracy of the article's quotation drawn from Becker's interview:

> Q. Returning to the article, it quotes you. "'Quite honestly, I'm just very surprised given what he [Torgerson, the plaintiff] said publicly and privately to us that he was uninvolved,' Becker said." Is that an accurate quotation?
>
> A. [Becker]. I believe so, yes.

R. 22 at 118.

¶ 60. The plaintiff further contends that the interview notes might show that Becker provided Rowen with an interpretation of the Ethics Board letters different from that which the newspaper ultimately published and that such an interpretation would be evidence of actual malice if different from the characterization reported in the article. Becker's testimony, however, affirmed the article's characterization of what Becker told Rowen he intended the Ethics Board letters to mean. R. 22 at 119–20, 124–26. While it is possible that Becker told Rowen something to indicate that the Ethics Board letters were not warnings to stay out of title insurance matters, such a statement would be inconsistent with Becker's testimony in this record.

¶ 61. To find sufficient evidence of actual malice to support a jury verdict in favor of the plaintiff in this case would require the court to ignore Becker's deposition testimony and to accept the plaintiff's bare allegation of actual malice supported only by an inference from the destruction of the notes. Such an

inference, however, is of little or no weight when the uncontroverted deposition testimony makes the plaintiff's assertion no more than a remote possibility. A motion for summary judgment cannot be denied on such a remote possibility, whether or not the clear and convincing evidentiary standard is applied. The plaintiff has not raised a jury issue of actual malice and the newspaper is entitled to summary judgment as a matter of law.

¶ 62. A court's role is to interpret and apply the law, not to enforce standards of journalistic accuracy or ethics. The United States Supreme Court has explained that its decisions in media defamation cases are "premised on a recognition that, as Madison put it, 'Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press.' " *Time, Inc. v. Pape*, 401 U.S. at 290 (citation omitted). As the Seventh Circuit Court of Appeals has stated and as the Wisconsin court of appeals repeated: "[J]ournalism skills are not on trial in this case. The central issue is not whether [the article] measured up to the highest standards of reporting or even to a reasonable reporting standard, but whether the defendant[] published [the article] with actual malice." *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 489 (7th Cir. 1986), *quoted* in *Torgerson*, unpublished slip op. at 18–19.

¶ 63. Because we conclude as a matter of law that the plaintiff has not furnished sufficient evidence of actual malice to survive the newspaper's motion for summary judgment, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.