COURT OF APPEALS
DECISION
DATED AND FILED

March 18, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos.   **2020AP121**
             **2020AP1570**

Cir. Ct. No.  2018CV3122

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

LEONARD POZNER,

   PLAINTIFF-RESPONDENT,

 V.

JAMES FETZER,

   DEFENDANT-APPELLANT.

---

IN RE THE FINDING OF CONTEMPT IN POZNER V. FETZER:

LEONARD POZNER,

   PLAINTIFF-RESPONDENT,

 V.

JAMES FETZER,

   DEFENDANT-APPELLANT.

---

APPEALS from a judgment and orders of the circuit court for Dane County: FRANK D. REMINGTON, Judge. *Affirmed*.

Before Fitzpatrick, P.J., Blanchard, and Kloppenburg, JJ.

¶1 FITZPATRICK, P.J. Leonard Pozner brought this defamation lawsuit against James Fetzer because of statements published by Fetzer concerning a copy of a death certificate for Pozner's son, N.,[1] which Pozner posted on the internet. In the statements, Fetzer alleged that the death certificate released by Pozner is a "fake," "forgery," and a "fabrication." The Dane County Circuit Court granted partial summary judgment to Pozner and determined that Fetzer's statements are defamatory. The issue of Pozner's damages was tried to a jury, which returned a verdict awarding $450,000.

¶2 In appeal number 2020AP121, Fetzer appeals the partial summary judgment decision of the circuit court that his statements are defamatory and the circuit court's rulings on Fetzer's motions for a new trial. In a separate appeal, number 2020AP1570, Fetzer appeals the post-trial order of the circuit court granting Pozner's request for a monetary remedial contempt sanction against Fetzer based on Fetzer's second intentional violation of a protective order entered by the circuit court.[2] For the following reasons, we affirm each of the circuit court's rulings.

---

[1] Because N. was a minor and the victim of a crime, we use an initial in place of the victim's name.

[2] For the purpose of deciding these appeals, we consolidated appeal numbers 2020AP121 and 2020AP1570 in an order dated February 10, 2021. To facilitate consolidation, the appeal of the contempt order in appeal number 2020AP1570 was converted from a one-judge opinion to a panel opinion in an order dated February 10, 2021. *See* WIS. STAT. § 752.31(2)(h) and (3) (2019-20).

(continued)

## BACKGROUND

¶3    The following material facts are taken from the summary judgment submissions and trial testimony, as discussed in more detail in the Discussion section of this opinion. There is no reasonable dispute regarding the following facts.

¶4    On December 14, 2012, a mass shooting occurred at Sandy Hook Elementary School in Newtown, Connecticut.[3] Tragically, twenty-six people were killed, including six staff members and twenty children who were aged six and seven. *See, e.g.*, ***Jones v. Heslin***, No. 03-19-00811-CV, 2020 WL 1452025, at *1, *4 (Tex. Ct. App. Mar. 25, 2020) (stating "Neil Heslin's son … was killed in the Sandy Hook Elementary School Shooting in December 2012" and rejecting the substantial truth doctrine as a basis to dismiss Heslin's defamation claim related to statements disputing Heslin's assertion that he held his deceased son in his arms); ***Soto v. Bushmaster Firearms Int'l, LLC***, 202 A.3d 262, 272 (Conn. 2019) ("On December 14, 2012, twenty year old Adam Lanza forced his way into Sandy Hook Elementary School in Newtown and, during the course of 264 seconds, fatally shot twenty first grade children and six staff members, and wounded two other staff members."). Pozner's six-year-old son, N., was one of the children killed during the Sandy Hook shooting.

---

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[3] We refer to the mass shooting that occurred at Sandy Hook Elementary School as the "Sandy Hook shooting."

¶5     Fetzer, a Wisconsin resident, takes the position that the Sandy Hook shooting was an "elaborate hoax" which, according to Fetzer, was staged by government authorities with the "agenda to deprive U.S. citizens of their rights pursuant to the Second Amendment of the U.S. Constitution." Fetzer takes the position that no one was killed during the Sandy Hook shooting and that part of the "elaborate hoax" included the fabrication of a "fiction[al]" person "called [N.]" Before and during this litigation, Fetzer has asserted that Pozner is a "fraud," "liar," "hypocrite," and "con-artist," and he has accused Pozner of concealing his true identity. Fetzer has also accused Pozner of "engaging in a massive cover-up" with regard to the Sandy Hook shooting. Fetzer is an editor of the book NOBODY DIED AT SANDY HOOK: IT WAS A FEMA DRILL TO PROMOTE GUN CONTROL (2d ed. 2016), and is the co-author of chapter 11 of that book, which is titled "Are Sandy Hook skeptics delusional with 'twisted minds'?"

¶6     In November 2018, Pozner brought this defamation action against Fetzer.[4] In his complaint, Pozner alleged that, following N.'s murder, "conspiracy

---

[4] In the circuit court, a number of additional claims were brought that are not before this court on appeal. In addition to his claim against Fetzer, Pozner brought suit against Wrongs Without Wremedies, LLC, the publisher of NOBODY DIED AT SANDY HOOK: IT WAS A FEMA DRILL TO PROMOTE GUN CONTROL (2d ed. 2016), and Mike Palecek, a co-editor of NOBODY DIED AT SANDY HOOK (1st ed. 2015). After settlements were reached, Pozner's claims against Wrongs Without Wremedies and Palecek were dismissed by the circuit court upon joint motions by Pozner and those defendants. Pozner's claims against Wrongs Without Wremedies and Palecek are not at issue in this appeal.

In addition to his defamation claim, Pozner also alleged a conspiracy claim against Fetzer. Pozner has abandoned that claim and it is not at issue in this appeal.

Fetzer brought counterclaims against Pozner alleging abuse of process, fraud and theft by deception, and fraud upon the court. Pozner filed a motion requesting the dismissal of Fetzer's counterclaims. The circuit court granted Pozner's motion. Fetzer's counterclaims are not before us on appeal.

Pozner cross-appealed, but later voluntarily dismissed his cross-appeal in number 2020AP121.

theorists began to claim that [N.] was not killed in the tragedy, that [Pozner] was not N.'s father, and that [Pozner] was complicit in a grand conspiracy to fake the massacre." To debunk those claims and to prove that N. was killed during the Sandy Hook shooting, Pozner posted a copy of N.'s death certificate on the internet.[5] Pozner alleged that, in NOBODY DIED AT SANDY HOOK (2016), Fetzer made the following defamatory statements concerning Pozner and the copy of N.'s death certificate released by Pozner:

- "[N.]'s death certificate is a fake, which we have proven on a dozen or more grounds." NOBODY DIED AT SANDY HOOK 183 (2016).

- "As many Sandy Hook researchers are aware, the very document [(N.'s death certificate)] Pozner circulated in 2014, with its inconsistent tones, fonts, and clear digital manipulation, was clearly a forgery." *Id.* at 242.

- "[Pozner] sent [Kelly Watt][6] a death certificate, which turned out to be a fabrication." *Id.* at 232.

Beyond that, Pozner alleged that Fetzer falsely stated the following in an August 5, 2018 post on a blog concerning the death certificate released by Pozner: "[N.'s death certificate] turned out to be a fabrication, with the bottom half of a real death certificate and the top half of a fake, with no file number and the wrong

---

[5] Pozner alleges in an affidavit filed in this action that he posted a copy of N.'s death certificate "to show that [N.] was a real boy who actually lived and actually died."

[6] Fetzer stated in NOBODY DIED AT SANDY HOOK (2016) that Kelly Watt "spent more than 100 hours in conversation with [Pozner]" and that, when she informed Pozner that she "d[id] not believe [Pozner] had a son or that his son had died, [Pozner] sent her a death certificate [for N.]." *Id.* at 232.

estimated time of death at 11 AM, when 'officially' the shooting took place between 9:35-9:40." Fetzer does not dispute that he published each of the alleged defamatory statements.[7]

¶7     Pozner filed a motion for partial summary judgment requesting a determination from the circuit court that Fetzer defamed Pozner by publishing the alleged defamatory statements. Fetzer opposed Pozner's motion for summary judgment, and Fetzer filed a motion for summary judgment requesting a determination from the circuit court that the alleged defamatory statements are not false. Pozner and Fetzer each filed materials supporting their motions, and the circuit court heard lengthy arguments about the motions. The circuit court granted partial summary judgment in favor of Pozner, and denied Fetzer's motion for summary judgment, based on the circuit court's determination that there are no genuine issues of material fact, and Fetzer's statements are defamatory.

¶8     Prior to trial, the circuit court found Fetzer in contempt of court for intentionally disclosing Pozner's video deposition taken in this action to a person not allowed to have the deposition in violation of the protective order[8] previously entered by the circuit court. As part of the remedy for that contumacious act, Pozner was allowed to introduce evidence of Fetzer's contempt of court during the trial.

---

[7] Throughout this opinion we refer to the four statements identified by Pozner in his complaint as defamatory as either the "alleged defamatory statements" or "the defamatory statements" based on the then-current procedural status of the case.

[8] We generally refer to this order as "the protective order."

¶9    The issue of Pozner's damages caused by Fetzer's defamatory statements was tried to a jury. The jury was tasked with answering one special verdict question:

> Question 1: What sum of money, if any, will fairly and reasonably compensate Mr. Pozner because of Mr. Fetzer's defamatory statements?

The jury's answer was $450,000.

¶10    Fetzer filed post-verdict motions requesting that the circuit court's order of partial summary judgment be vacated, and that he be granted a new trial. We will discuss those motions later in this opinion. The circuit court denied Fetzer's post-verdict motions. Based on Pozner's post-trial motion, the circuit court entered an order permanently enjoining Fetzer from repeating the alleged defamatory statements.

¶11    Also post-trial, Pozner filed a second motion requesting a finding of contempt of court because Fetzer violated the protective order a second time by again providing Pozner's deposition in this case to a person not allowed to have the deposition under the terms of that order. The circuit court found that Fetzer had for a second time intentionally violated the court's protective order and, for reasons stated by the circuit court that are discussed later in this opinion, the circuit court granted a remedial contempt monetary sanction of $650,000 against Fetzer.

¶12    Fetzer appeals. Additional material facts are set forth in our discussion.

7

**DISCUSSION**

¶13    Fetzer argues that the circuit court erred in:  granting partial summary judgment in favor of Pozner and determining that Fetzer's statements are defamatory; denying Fetzer's motions for a new trial; and granting the remedial contempt monetary sanction based on Fetzer's second intentional violation of the protective order.  We begin by addressing Fetzer's arguments concerning the circuit court's grant of partial summary judgment.

### I.  Partial Summary Judgment in Favor of Pozner.

¶14    Fetzer makes three separate arguments on appeal challenging the circuit court's grant of partial summary judgment in favor of Pozner on the defamation issue:  (1) the circuit court committed "structural error" by preventing Fetzer from presenting a particular defense theory at the summary judgment stage; (2) there were material facts in dispute regarding the falsity of the defamatory statements; and (3) because Fetzer now alleges that he is a member of the "media," the circuit court was required to determine whether Fetzer was negligent in making the defamatory statements.  Before we address each of those arguments, we next explain summary judgment procedure, our standard of review, and governing principles regarding defamation.

### A.  Summary Judgment Procedure, Standard of Review, and Governing Principles.

¶15    Summary judgment is proper, and the moving party is entitled to judgment as a matter of law, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2); *see Bank of N.Y. Mellon v. Klomsten*, 2018 WI App 25, ¶31, 381 Wis. 2d 218, 911 N.W.2d 364. This court views the summary judgment materials "in the light most favorable to the party opposing summary judgment." *United Concrete & Constr., Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, ¶12, 349 Wis. 2d 587, 836 N.W.2d 807. We review de novo a summary judgment determination of the circuit court. *Bank of N.Y. Mellon*, 381 Wis. 2d 218, ¶31.

¶16 The elements that must be established to prove a claim of defamation differ depending on whether the defendant is considered to be a member of the "news media," and whether the plaintiff is considered a public or non-public figure. *See Denny v. Mertz*, 106 Wis. 2d 636, 643-46, 651-52, 318 N.W.2d 141 (1982); *see also Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534-35, 563 N.W.2d 472 (1997). As applicable to this case, the starting point is that a plaintiff (such as Pozner) alleging a claim for defamation must prove three elements: (1) a false statement was made by Fetzer concerning Pozner; (2) the statement was communicated in writing to a person other than Pozner; and (3) the communication tends to harm Pozner's reputation so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *See Laughland v. Beckett*, 2015 WI App 70, ¶22, 365 Wis. 2d 148, 870 N.W.2d 466; *Schaul v. Kordell*, 2009 WI App 135, ¶10, 321 Wis. 2d 105, 773 N.W.2d 454. Of these three elements, only the falsity of the defamatory statements was in dispute at the summary judgment stage.

¶17 In addition to the three elements set forth above, if the communicated statement is made by a "news media" defendant, a fourth element must be shown to establish a defamation claim. In that case, the plaintiff must prove the additional element of negligence on the part of the defendant. *See*

***Denny***, 106 Wis. 2d at 652-54.[9] As will be discussed below, Fetzer argues on appeal that Pozner was required to establish the additional element of negligence because Fetzer now asserts that he is a "media defendant."

¶18 We next consider each of Fetzer's arguments regarding the circuit court's grant of partial summary judgment.

## B. The Circuit Court Did Not Prevent Fetzer From Presenting His Defense Theory.

¶19 To repeat, the defamatory statements asserted that the copy of the death certificate for N. that was released by Pozner is a "fake," "forgery," and "fabrication." Fetzer contends on appeal that the defamatory statements are not false. *See **Laughland***, 365 Wis. 2d 148, ¶23 ("'Substantial truth' is a defense to a defamation action."); ***Ladd v. Uecker***, 2010 WI App 28, ¶8, 323 Wis. 2d 798, 780 N.W.2d 216 (stating "[t]ruth is a complete defense" to a common law action for defamation). Fetzer contends that, "if the entire Sandy Hook narrative is false, then death certificates associated with that event," including the copy of the death certificate that Pozner released, "also must necessarily be false." Fetzer argues that the circuit court foreclosed him from an attempt to prove that there is a genuine issue of material fact about whether the Sandy Hook shooting occurred, and that the ruling by the circuit court was a "structural error" which requires

---

[9] If the communicated statement is about a public figure, as opposed to a non-public figure, the plaintiff must also prove actual malice on the part of the defendant. ***Torgerson v. Journal/Sentinel, Inc.***, 210 Wis. 2d 524, 535-36, 563 N.W.2d 472 (1997) (citing ***Masson v. New Yorker Mag., Inc.***, 501 U.S. 496, 510 (1991)). For purposes of this appeal, there is no dispute that Pozner is a non-public figure and that Pozner was therefore not required to prove actual malice on Fetzer's part in order to prevail. Fetzer initially argued in the circuit court that Pozner is a "limited public figure." However Fetzer later abandoned that assertion and agreed that Pozner is a private, non-public figure.

reversal of the circuit court's summary judgment ruling. Our review of this issue is de novo. *State v. C.L.K.*, 2019 WI 14, ¶12, 385 Wis. 2d 418, 922 N.W.2d 807.

¶20 Fetzer's argument rests on two factual premises, both of which are necessary to his argument: that the circuit court barred Fetzer from asserting as a factual matter in summary judgment that the Sandy Hook shooting did not occur; and that, after that purported ruling of the circuit court, Fetzer made no such factual assertion and "respectfully accepted the court's defense-limiting directive." For the following reasons, both premises fail.

¶21 In support of his argument, Fetzer points only to a single comment made by the circuit court, about a "path" to a "rabbit hole" made during a hearing about discovery disputes in this action.[10] From that one comment, Fetzer contends that the circuit court broadly barred him from proffering evidence that the Sandy Hook shooting did not occur. Because it is important to our analysis, we next consider the context of the circuit court's comment.

¶22 The comment by the circuit court relied on by Fetzer occurred during a March 2019 hearing at which the court addressed Pozner's motion requesting that the court direct that Pozner need not respond to certain discovery requests from Fetzer because the information and documents requested by Fetzer were not likely to lead to discoverable information and were not proportional pursuant to WIS. STAT. § 804.01(2)(a) and (am).

---

[10] In his briefing in this court, Fetzer twice misquotes the circuit court's comment and once gives an incorrect cite to the record for the quote.

¶23     The comment by the circuit court on which Fetzer relies was made by the circuit court during a specific discussion about whether Pozner should be relieved from responding to a discovery request from Fetzer that Pozner "[p]roduce all court records of any lawsuits … Pozner has brought against Sandy Hook skeptics."  Immediately before the "rabbit hole" comment, the circuit court stated:

> THE COURT: … [T]he reason I'm going through this somewhat lengthy exchange on the Motion [and] … on the request for production of documents is … [so that Fetzer] would get a sense of what I think is the appropriate course of discovery.

¶24     We now consider some examples of why the circuit court made that broader statement about the proper scope of discovery.

¶25     Fetzer asked Pozner to produce N.'s original kindergarten report card.  The circuit court ruled that N.'s "original report card from kindergarten is far beyond the relevance of this case in terms of the truth or falsity … of the death certificate."  Fetzer also asked Pozner to produce Pozner's own birth certificate. The circuit court ruled that "Pozner's existence is not an issue in this case and is not likely to lead to the discovery of any relevant information," and the circuit court denied Fetzer's request for production of the birth certificate of N.'s mother and the marriage license for N.'s parents for similar reasons.[11]

---

[11] As another example, Fetzer asked Pozner in discovery to:

> Admit that Exhibit N, "Fabricated Passport of [N.], includes a passport number with '666' as its middle digits, the occurrence of which by chance is so remote it appears to be telegraphing that the alleged [Sandy Hook Elementary School] shooting was a hoax that had Satanic elements."

¶26    However, pertinent to our discussion of this issue, the court denied Pozner's motion concerning Fetzer's request for information about N.'s funeral expenses. The circuit court determined that "if the defense theory is that this is a fraudulent death certificate because no human [N.] existed, then in theory, possibly, if there were no expenses related to a funeral or burial, that might be consistent with [Fetzer's] theory," and for similar reasons the circuit court ordered production of a copy of N.'s birth certificate.

¶27    At the same hearing, the circuit court took up Fetzer's request for discovery from Pozner based on Fetzer's contention that N. appeared alive in Pakistan about two years after the Sandy Hook shooting. Germane to the issue now before us, the circuit court made the following statements, which establish that the court did not foreclose Fetzer from presenting facts about whether the Sandy Hook shooting occurred:

> THE COURT: Mr. Fetzer…. Discovery is not your only avenue to gather the facts that you think support your defense of the case…. [P]resumably, since you're asking for it, you have a copy of some photograph, and the burden is on you or your co-defendants to try to admit that document. You can't sort of upend the rules of evidence by saying that I know that this document that appeared in a Pakistani newspaper somewhere or some newspaper regarding a massacre in Pakistan I'm going to try to get from Mr. Pozner.
>
> … I envision there's going to be a lot of things you'll try to do to defend yourself and that's fine…. I'm not making rulings here on the rules of evidence. I'm trying to do [what] I'm required to do on a request for a protective order to balance [based on] the issues in the Complaint as I understand it today and to put the context of the discovery in its reasonable position based on the facts of the case.

Later at the same hearing, the following exchange occurred:

> MR. FETZER: -- the Defendant is going to argue … the death certificate is a fabrication, that [N.] is a fiction that was made out of photographs of another child when he was younger, and explain the context within which this took place just in order for the Court -- for the jury to understand, for it to make it intelligible what's going on here.

> THE COURT: Well, Mr. Fetzer, I'm not ruling on motions in limine. I'm not telling you what the trial is about. I'm ruling on the Motion for Protective Order as I understand it today[,] having carefully considered the precise words you chose in your request for production of documents.

¶28 Fetzer characterizes the circuit court's "rabbit hole" comment as the circuit court's limitation on the factual defenses Fetzer could assert in this action against the allegations in Pozner's defamation cause of action. However, looking at the March 2019 hearing transcript in its entirety, it is manifest from the circuit court's statements and rulings at that hearing that the circuit court did not bar Fetzer from asserting any particular factual defense. Instead, the circuit court only limited the breadth of information and documents Fetzer could obtain from Pozner during pre-trial discovery under Wisconsin's discovery rules. *See generally* WIS. STAT. ch. 804.

¶29 Fetzer's other premise also fails. Contrary to what Fetzer argues on appeal, he did not stop arguing his factual theory of defense. As one example, at the hearing of June 4, 2019, Fetzer argued as follows:

> Nobody died at Sandy Hook, Your Honor. This was a FEMA drill that was presented … as a mass shooting to promote gun control.

> One of my contributors, the 13 contributors to the book, NOBODY DIED AT SANDY HOOK, including 6 current and retired PhD professors, we establish the school had been closed by 2008; that there were no students there; that it was done to promote gun control. (Italicization omitted and small capitalization added.)

14

Indeed, at the summary judgment hearing, Fetzer continued to make that factual argument as shown by this example, which is illustrative of several:

> All of these oddities are more readily explicable on the hypothesis that [N.] is a fiction made up out of photographs of his purported older step-brother …. When we consider that we may be dealing with an illusion rather than reality, where the Sandy Hook event was a FEMA mass casualty exercise involving children to promote gun control that was then presented to the public as mass murder, the pieces made sense.

As a result, there is no basis to support the premise that Fetzer stopped asserting this factual defense before or at the summary judgment hearing.[12]

¶30 Thus, although the circuit court limited the breadth of Fetzer's pre-trial discovery, the court did not, as Fetzer argues, restrict or prohibit any defense Fetzer sought to assert. Accordingly, we reject Fetzer's argument that the circuit court erroneously foreclosed him from pursuing a theory of defense in summary judgment.[13]

---

[12] In an attempt to bolster his argument that the circuit court barred Fetzer, before summary judgment was granted, from arguing that the Sandy Hook shooting did not occur, Fetzer contends in briefing in this court that the circuit court "cautioned counsel" at trial not to raise that factual defense. The citation to the record from Fetzer for that assertion shows nothing of the sort. The only relevant statement from the circuit court in that portion of the record is a comment made to counsel outside the presence of the jury: "This is not a trial to defend the academic excellence of the book, NOBODY DIED AT SANDY HOOK." (Italicization omitted and small capitalization added.) At most, the court's one sentence recognized that the question of whether the statements were defamatory was not an issue for the jury. Nothing about that statement, in context or in isolation, leads to the conclusion that the circuit court barred Fetzer before partial summary judgment was granted from raising this theory of defense.

[13] Because our decision that Fetzer fails to establish that the circuit court precluded him from pursuing a theory of defense in summary judgment is dispositive, we do not address his argument that any such an error is "structural" and as such cannot be subjected to a harmless error analysis. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (if a decision on one point disposes of the appeal, the court will not decide other issues raised). In any event, there is a strong presumption that errors are not structural. *State v. C.L.K.*, 2019 WI 14, ¶¶14-15, 385 Wis. 2d 418, 922 N.W.2d 807.

15

### C. There Are No Material Facts In Dispute as to the Falsity of the Defamatory Statements.

¶31    Fetzer contends that there are disputed material facts as to the falsity of the defamatory statements that prevent a grant of partial summary judgment in Pozner's favor.[14]

¶32    The party moving for summary judgment, here, Pozner, bears the burden of establishing a prima facie case for summary judgment through affidavits and other submissions.  *See* **State v. Dunn**, 213 Wis. 2d 363, 368, 570 N.W.2d 614 (Ct. App. 1997).  If Pozner does so, the burden shifts to the opposing party, here, Fetzer, to point to evidence showing that material facts are in dispute.  **Id.**[15]  The party against whom summary judgment has been brought cannot rest upon the pleadings, but must set forth specific facts that are admissible in evidence showing that there is a genuine issue for trial.  WIS. STAT. § 802.08(3); **Helland v. Kurtis A. Froedtert Mem'l Lutheran Hosp.**, 229 Wis. 2d 751, 756, 601 N.W.2d 318 (Ct. App. 1999).

### 1.  Pozner's Prima Facie Case for Summary Judgment.

¶33    We now discuss whether Pozner established a prima facie case for summary judgment regarding the falsity of the defamatory statements.

---

[14] Fetzer also contends that the circuit court did not carefully address his arguments as to the falsity of the defamatory statements or rule on the authenticity of the death certificate.  The record flatly refutes this contention.  In any event, because our review is de novo, we do not further consider this contention.

[15] The first step in summary judgment procedure is to determine whether the complaint states a valid cause of action and whether the answer of the defendant properly joins issue.  **State v. Dunn**, 213 Wis. 2d 363, 368, 570 N.W.2d 614 (Ct. App. 1997).  The parties do not discuss this first step, and we agree that both parties have satisfied this first step.

¶34 Pozner submitted to the circuit court an affidavit in which he averred that the following is true:

- Pozner fathered a child named N., who was born, along with a twin sister, in 2006, and N. "is now deceased."

- Pozner posted a certified copy of N.'s death certificate on the internet through a social network page dedicated to N.'s memory. The death certificate Pozner posted "was one of several certified copies that had been issued to [him] by the Newtown records clerk in 2013." After receiving a copy of N.'s certified death certificate, Pozner was never in possession of an incomplete or uncertified copy of N.'s death certificate and he "did not enter any information into any of the boxes on [N.'s] death certificate." Attached as exhibits to Pozner's affidavit are "[t]rue and correct scans of [the death certificates] [he] obtained from the Newtown clerk" which "include embossed seals … [that] are not well reflected in [the] scans."[16]

¶35 Pozner also submitted to the circuit court the affidavit of Abraham Green, who averred that the following is true.

- Green is a licensed funeral director in Connecticut.

- "[Green's] funeral home prepared [N.'s] body for burial and held [N.'s] funeral service," Green "was personally involved in that

---

[16] Fetzer does not dispute that, at the hearing on the summary judgment motions, counsel for Pozner handed to the circuit court the originals of the certified death certificates Pozner obtained from the town, and the circuit court noted on the record the presence of the embossed seals on the documents.

process," and he "personally performed the preparation of [N.'s] body for his funeral." N.'s remains were "obtained … from the medical examiner" and "[Green's] funeral home obtained the death certificate form, at that point only partially completed, from the Office of the Chief Medical Examiner."

- "Connecticut uses two death certificate forms …. One form … is for anticipated deaths …. The other, form 'VS-4ME' is for deaths investigated by the Medical Examiner." N.'s death "was investigated by the Medical Examiner." "The process of filling out a VS-4ME death certificate involves multiple entities entering information at different times" and "[a]t the time of [N.'s] death and funeral, [Green's] funeral home typically used a typewriter to fill out death certificates."

- Green attached a copy of N.'s death certificate to his affidavit. Green's "funeral home entered information in boxes 1, 2 and 5-22, 28-35, and boxes 54-58 as well as the social security number on [N.'s] death certificate." That information in the copy of the N.'s death certificate attached to Green's affidavit "is unchanged from the information [he] typed in those boxes in December of 2012, with the exception of redactions in boxes 29, 30 [(which concern the cemetery and city where N. is buried)] and the decedent's social security number."

¶36 Pozner's attorney, Jacob Zimmerman, submitted an affidavit to which he attached the following exhibits.

18

- A certified copy of N.'s birth certificate. This document states that N. was born on November 20, 2006 at Danbury Hospital in the State of Connecticut to Pozner and Veronique Pozner. The document was issued on April 23, 2019, and was signed by the Registrar beneath the following attestation language: "I hereby certify that this is a true certificate of live birth issued from the official records on file." (Capitalization omitted.) The document shows faint marks left from an embosser and a seal.

- Copies of certified medical records from Danbury Hospital pertaining to N. Those medical records concern medical billings and records from the date of N.'s birth through at least February 2012.

- A "true and correct copy of a certified copy of the report filed by the Office of the Chief Medical Examiner of the State of Connecticut." The document is comprised of a written description of the post-mortem examination of N.'s body conducted by the Chief Medical Examiner on December 15, 2012, and a "REPORT OF INVESTIGATION" form. The written description of N.'s post-mortem examination: describes N.; identifies and describes three separate gunshot wounds; and lists N.'s cause of death as "MULITPLE GUNSHOT WOUNDS." We now set forth information in separate sections of that form.

  o The "DECEASED" section of the document states in pertinent part that N., age 6, died at 12 Dickinson Drive, Sandy Hook, CT (which is the address of the school).

  o The "CIRCUMSTANCES OF DEATH" section states:

On 12/14/12 at 1115 hours Sgt. James Thomas of Connecticut Central District Major Crimes informed me that there were at least twenty fatalities at the Sandy Hook Elementary School as a result of a shooting. The extent of the shooting was not known until Dr. Carver assessed the scene and it was reported that there were two child victims at Danbury Hospital and twenty-five at the scene. Once at the scene we generated case numbers for each victim, tagged each victim with a case number, and once positive identifications were made the victims information was appropriately added. All victims were pronounced at the scene on 12/14/12 at 1100 hours by EMS.

o The "EXTERNAL EXAMINATION" section of the document states that N. was "Examined At" "Sandy Hook Elementary School" on "12/14/12," and further states:

The body is that of a white male approx. 6 years. Decedent is supine on the floor in classroom eight.

Head hair is dark brown[.] He is clad in a red and black hooded sweat shirt with Batman on the front, black sneakers with red and gray, white socks and underwear. There are two EKG tabs on the upper chest and two on the lower torso.

There are injuries noted to the right lower mouth and chin area.

o The "CERTIFICATION" section states beneath "Date" "12/15/12." Beneath "Name of Investigator," "Louis[] Rinaldi" is stated and beneath his name is the following typed notation: "****Typographical Errors Corrected on 12/5/13" Beneath "Signed" is a signature that appears to be that of Louis Rinaldi.

20

- A "true and correct copy of a certified copy of [N.'s] death certificate, issued by the State of Connecticut Department of Vital Records in November of 2018."

- A "true and correct copy of a probate court order [regarding N.] issued on December 10, 2014 by the State of Connecticut Probate Court."

¶37   On appeal, Fetzer does not challenge the circuit court's determination that Pozner's submissions established a prima facie case for summary judgment on the issue of falsity of the defamatory statements.  In other words, Fetzer does not dispute that Pozner made a prima face case that the copy of N.'s death certificate that Pozner released is not a fake, forgery, and fabrication.  Rather, Fetzer challenges on appeal the circuit court's determination that Fetzer did not point to admissible evidence to show that there is a genuine issue of material fact concerning whether the death certificate Pozner released is a fake, forgery, or fabrication.  *See Leszczynski v. Surges*, 30 Wis. 2d 534, 539, 141 N.W.2d 261 (1966) ("To defeat [a] motion [for summary judgment], the statute requires the opposing party by affidavit or other proof to show facts which the court shall deem sufficient to entitle him [or her] to a trial.").

### 2. Fetzer Did Not Rebut Pozner's Prima Facie Case For Partial Summary Judgment.

¶38   For context, we first note what Fetzer does not argue on appeal. Fetzer's reasoning stated in the book and his blog regarding why he believed N.'s death certificate released by Pozner is a fake, forgery, and fabrication were the following allegations:  part of N.'s death certificate was created by a photoshop computer program, N.'s death certificate has a missing file number and has

21

inconsistent tones, fonts, and textures. Fetzer abandoned those reasons at the summary judgment hearing in the circuit court when he stated:

> In this case, my premises may have been mistaken or wrong -- the absent file number, the differences in tone and texture, the variations in font sizes and spacing, which led me to believe that this document had been created by combining the bottom half of a real death certificate with the top half of a fake -- given what I have learned in the meanwhile, do not appear to have been right.

Fetzer then explicitly stated to the circuit court that those reasons given in the book and his blog were "wrong."

¶39 Further, Fetzer does not dispute in any meaningful way on appeal that N.'s death certificate released by Pozner (which Fetzer claims is a fake, forgery, and fabrication) is identical to N.'s death certificate from, and certified by, the Newtown, Connecticut Registrar (which Fetzer agrees is authentic) with the very few exceptions we now consider.[17] The death certificate released by Pozner redacted the name of the cemetery and the city where N. is buried as well as N.'s social security number (all for purposes of privacy), and the portions of N.'s death certificate regarding N.'s residence and his parents' mailing address

---

[17] In this appeal, in a vague manner, Fetzer asserts that there are purported discrepancies between the copy of the death certificate released by Pozner and the copies of N.'s death certificate that were submitted to the circuit court by affidavit, in that there are "differing notations; and – written state file numbers; empty information boxes on the different versions" of the certificates in the record. However, Fetzer makes no discernable argument about why such purported discrepancies (assuming those exist) might lead to the conclusion that N.'s death certificate released by Pozner was fabricated, and we reject those contentions for that reason. *Associates Fin. Servs. Co. of Wis., Inc. v. Brown*, 2002 WI App 300, ¶4 n.3, 258 Wis. 2d 915, 656 N.W.2d 56 (declining to address undeveloped arguments). Moreover, Fetzer does not provide this court with citations to the record to support several of his factual allegations on this issue. We could reject portions of Fetzer's argument on that basis alone. *See* WIS. STAT. RULE 809.19(1)(e); *see Grothe v. Valley Coatings, Inc.*, 2000 WI App 240, ¶6, 239 Wis. 2d 406, 620 N.W.2d 463 (declining to address arguments not supported by citations to the record).

were later corrected by the registrar as is stated on the certificate. Put another way, Fetzer does not assert that any difference or combination of differences between N.'s death certificate released by Pozner and N.'s certified death certificate from the registrar causes there to be a genuine issue of material fact that the death certificate released by Pozner is fake.

¶40 Fetzer's only argument remaining on appeal is this narrow assertion: Pozner released a copy of N.'s death certificate that lacks a "narrative certification," and that is sufficient to raise a genuine issue of material fact about whether the released death certificate is a fake, forgery, and fabrication.[18]

¶41 Fetzer begins his argument with the assertion that "Connecticut law … prohibits even a parent from having such an uncertified death certificate" and he cites generally to CONN. GEN. STAT. § 7-51a (2012)[19] without quotation, or any

---

[18] That this is Fetzer's argument is confirmed in his reply filed in this court:

> Pozner misunderstands the "difference that matters" as to the multiple versions of the death certificate. Fetzer contends that the death certificate circulated by Pozner lacked a narrative certification by the Town Registrar. The death certificate discussed in the book "Nobody Died at Sandy Hook" lacks the Registrar's certification, which is the version published in the Book, as obtained from Pozner. The version of the death certificate attached to Pozner's Complaint, however, includes a narrative certification by the Registrar on the left margin of the document. The absence of the narrative certification by the Registrar is the "difference" relevant to summary judgment.

(Internal record citations omitted.)

[19] That statute states in pertinent part:

(continued)

analysis, of the statute. We take no positon on the applicability of that statute in these circumstances. Regardless, Fetzer does not dispute that, as mentioned earlier and confirmed by the circuit court at the summary judgment hearing, the death certificate released by Pozner and placed in the record in this case has a raised seal from the town, which is evidence that the document was certified. Instead, as mentioned, Fetzer goes a different route and focuses exclusively on the fact that all certified copies of N.'s death certificate have an attestation (what Fetzer calls a "narrative certification") along the edge of the certificate stating: "I certify that this is a true copy of the certificate received for record. Attest: Debbie A. Aurelia, Registrar." (Capitalization omitted.) From that, Fetzer argues that, because the attestation is not shown on N.'s death certificate "discussed in the book 'Nobody Died at Sandy Hook,'" there is a reasonable inference that N.'s death certificate released by Pozner is a fake.

¶42 "[I]f more than one reasonable inference can be drawn from the undisputed facts, summary judgment is not appropriate." *Schmidt v. Northern States Power Co.*, 2007 WI 136, ¶47, 305 Wis. 2d 538, 742 N.W.2d 294. But, while we may draw inferences in favor of the non-moving party, we are not

---

(a) Any person eighteen years of age or older may purchase certified copies of marriage and death records, and certified copies of records of births or fetal deaths which are at least one hundred years old, in the custody of any registrar of vital statistics. The department may issue uncertified copies of death certificates for deaths occurring less than one hundred years ago, and uncertified copies of birth, marriage, death and fetal death certificates for births, marriages, deaths and fetal deaths that occurred at least one hundred years ago, to researchers approved by the department pursuant to section 19a-25, and to state and federal agencies approved by the department.

CONN. GEN. STAT. § 7-51a (2012).

required to draw unreasonable inferences in Fetzer's favor. ***Morgan v. Pennsylvania Gen. Ins. Co.***, 87 Wis. 2d 723, 731, 275 N.W.2d 660 (1979); *see **Helland***, 229 Wis. 2d at 756 ("A party opposing a summary judgment motion must set forth 'specific facts,' evidentiary in nature and admissible in form, showing that a genuine issue exists for trial. It is not enough to rely upon unsubstantiated conclusory remarks, speculation, or testimony which is not based upon personal knowledge.").

¶43     As already discussed, there are no material differences between N.'s death certificate released by Pozner and what Fetzer agrees is a certified copy of N.'s death certificate. That alone is sufficient to establish that N.'s death certificate released by Pozner is not a "fake," "forgery," or "fabrication" by any applicable definition of each word. In addition, the only reasonable inference from the undisputed facts is that, at some point when Pozner released the death certificate online, or later when a copy of N.'s death certificate was placed in the book Fetzer co-edited, the attestation from the registrar was cropped off N.'s death certificate. It is in a location where this would be easy to do. That does not reasonably lead to the conclusion that the death certificate released by Pozner was a fake, forgery, or fabrication.

¶44     As a result, Fetzer does not raise a genuine issue of material fact regarding the falsity of the defamatory statements made by him.

¶45     Accordingly, we conclude that Fetzer has failed to overcome Pozner's prima facie showing, and partial summary judgment was properly granted in favor of Pozner on the issue of whether the defamatory statements were false.

### D. The Circuit Court Was Not Required to Determine Whether Fetzer Was Negligent.

¶46    Fetzer argues that, in order for Pozner to prevail on his defamation claim, Pozner was required to establish that Fetzer was negligent in publishing the defamatory statements because Fetzer published the statements as a member of the "media."  Fetzer contends that the circuit court erred in granting partial summary judgment in favor of Pozner because the court failed to consider whether Fetzer was negligent.

¶47    We now briefly summarize the legal context of Fetzer's argument. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the United States Supreme Court addressed the standard for defamation actions brought by private individuals against a "publisher or broadcaster."  The Supreme Court held that states are free to set their own standards for defamation actions brought by private individuals against a "publisher or broadcaster" so long as liability without fault is not imposed.  *Id.*, 418 U.S at 342-43, 347; *Denny*, 106 Wis. 2d at 651, 654.  The Supreme Court explained that this approach "recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation."  *Gertz*, 418 U.S. at 347-48.  In *Denny*, the Wisconsin Supreme Court adopted a negligence standard for defamation claims brought by a private individual against the "news media (publication or broadcasting)."  *See Denny*, 106 Wis. 2d at 651, 656-57.  That is to say, under *Denny* a private individual who claims that he or she has been defamed by the "news media" must "prove that [the] media defendant was negligent in broadcasting or publishing a defamatory statement."  *Id.* at 654.

26

¶48 Fetzer's argument that the circuit court erred in not requiring Pozner, under *Gertz/Denny*, to prove that he was negligent in publishing the defamatory statements fails for at least the following reasons, either of which is sufficient to reject Fetzer's argument.

¶49 The first reason is forfeiture. Fetzer agrees that he did not raise this issue before the circuit court on summary judgment, and it was first raised by Fetzer in his post-verdict motions.[20] As we have explained, "[o]nly the summary judgment submissions are relevant to the question whether the court properly [decided] summary judgment." *H & R Block E. Enters., Inc. v. Swenson*, 2008 WI App 3, ¶27 n.9, 307 Wis. 2d 390, 745 N.W.2d 421. The circuit court was not obligated to allow Fetzer to effectively sit back and allow a case to proceed based upon a certain standard and then, after that issue is determined against him, argue for the first time after summary judgment and trial that the standard applied was wrong. *See Paape v. Northern Assurance Co. of Am.*, 142 Wis. 2d 45, 53, 416 N.W.2d 665 (1987) ("Because the purpose of alerting the [circuit] court to any error is corrective in nature, i.e. to avoid a costly and time-consuming appeal, and is as salutary for summary judgment purposes as for motions after verdict, we conclude that the failure to present this error to the [circuit] court for its appraisal and correction constitutes waiver."); *Pabst Brewing Co. v. City of Milwaukee*, 125 Wis. 2d 437, 459-60, 373 N.W.2d 680 (Ct. App. 1985) ("As it appears that the payment under protest question was not considered a genuine issue until after the City lost the case, we deem the issue waived."); *see also State v. Huebner*, 2000 WI 59, ¶12, 235 Wis. 2d 486, 611 N.W.2d 727 (stating that the forfeiture rule

---

[20] In his brief-in-chief, Fetzer concedes that the negligence question "was not briefed, raised or intimated at the prior summary judgment hearing."

prevents "sandbagging" errors, or failing to object to an error for strategic reasons and later claim that the error is grounds for reversal).

¶50     Fetzer did not raise the question of negligence or his alleged membership in the "media" as a factual dispute as he was required to do in summary judgment.  As a result, Fetzer forfeited the argument that he was a member of the media, and that a showing of negligence was required before he could be held liable for his defamatory statements.[21]

¶51     The second reason involves the burden of showing news media status of a defendant.  An unstated premise in Fetzer's argument is that in any defamation claim there is, in effect, a default position that the defendant is considered a member of the "news media," and the plaintiff has the burden to show that the defendant is not a member of the news media or show that the defendant was negligent.  However, under Wisconsin law, it is not the plaintiff but the defendant who bears the burden of raising and establishing a conditional privilege (such as the news media defense raised by Fetzer) that may grant immunity from liability for defamation based on a public policy which recognizes the social utility of encouraging the free flow of information.  *See Calero v. Del Chem. Corp.*, 68 Wis. 2d 487, 498-99, 228 N.W.2d 737 (1975); *see also Talens v. Bernhard*, 669 F. Supp. 251, 256 (E.D. Wis. 1987).  Fetzer does not directly dispute that precept of Wisconsin law, but in support of his argument cites only *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1329 n.5 (5th Cir. 1993).  That

---

[21] While not dispositive to our analysis, we observe that, when Fetzer raised this issue in a post-verdict motion, the circuit court determined that it would have rejected on summary judgment Fetzer's contention that he is a "media defendant" and, even if Fetzer is a member of the media, the circuit court would have concluded that there is no genuine issue of material fact that Fetzer was negligent in making the defamatory statements.

one short footnote from a federal court opinion construing federal law does not answer the question of who has the burden on this issue under Wisconsin law and, moreover, gives no authority for the position stated in the footnote.

¶52    For those reasons, we reject Fetzer's argument that the circuit court erred in not determining whether he was negligent in making the defamatory statements.[22]

¶53    In sum, we affirm the circuit court's grant of partial summary judgment on the question of whether the statements made by Fetzer were defamatory.

## II.  Fetzer's Motion For a New Trial Based on an Evidentiary Ruling.

¶54    Fetzer argued in post-verdict motions that he is entitled to a new trial on the issue of damages because the circuit court erred in admitting what Fetzer refers to as "prejudicial" "character evidence" concerning Fetzer's intentional violation of the protective order of the circuit court.[23]  The circuit court denied Fetzer's motion, and we reject Fetzer's argument for the following reasons.

---

[22] To the extent Fetzer may be arguing in this court that it was the duty of the circuit court to identify and address this issue, Fetzer is wrong.  It was not the circuit court's burden or duty to construct an argument for Fetzer.  *See Service Emps. Int'l Union, Loc. 1 v. Vos*, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 (stating that courts do not develop or construct arguments for parties).

[23] The section of Fetzer's brief-in-chief concerning Fetzer's argument on this issue contains factual assertions but no citations to the record as required by WIS. STAT. RULE 809.19(1)(e).  Indeed, at one point in his briefing of this issue, Fetzer gives what purports to be a quote from Pozner's counsel's closing argument, but Fetzer gives no citation to the record for the quote.  We need not search the record for citations to support Fetzer's assertions, and we could reject Fetzer's argument on this basis alone.  *See id.*; *see Grothe*, 239 Wis. 2d 406, ¶6 (declining to address arguments not supported by citations to the record).

29

### A. Standard of Review.

¶55 We review a circuit court decision to admit or exclude evidence for an erroneous exercise of discretion. *State v. Jackson*, 2014 WI 4, ¶43, 352 Wis. 2d 249, 841 N.W.2d 791. This court independently reviews the record to determine whether the record provides a basis for the circuit court's exercise of discretion. *State v. Pharr*, 115 Wis. 2d 334, 343, 340 N.W.2d 498 (1983).

¶56 We next set forth additional pertinent facts regarding this issue. These additional facts also inform our analysis of Fetzer's second intentional violation of the same order of the circuit court that we discuss later in this opinion.

### B. Additional Pertinent Facts.

¶57 In April 2019 Pozner filed a motion in the circuit court requesting an order "establishing a process by which parties may designate documents or things confidential." As grounds for the motion, Pozner alleged that: Fetzer "has a history of exposing [Pozner's] confidential information and that of [N.]"; Fetzer had in this case improperly filed an unredacted image of N.'s United States passport via the circuit court's e-filing system;[24] Fetzer refused Pozner's request that Fetzer take steps to have the protected information redacted; and Fetzer posted Pozner's social security number on a blog shortly after Pozner initiated this lawsuit. Pozner also expressed concern that his image from his video deposition in this case would be released and used to harass him.

---

[24] Passport numbers are one of five categories of "[p]rotected information" not to be disclosed in the public record under WIS. STAT. § 801.19(1)(a). *See* § 801.19(1)(a)5.

¶58 The circuit court granted Pozner's motion. The court's protective order provided that the parties could designate information as "confidential" by "placing or affixing on the document or material … the word[] 'CONFIDENTIAL'" in specifically delineated circumstances. The order further provided:

> Information, documents, or other material designated as CONFIDENTIAL under this Order must not be used or disclosed by the parties or counsel … for any purposes whatsoever other than preparing for and conducting the litigation in which the information, documents, or other material were disclosed (including appeals).

¶59 In September 2019, Pozner sought a finding of remedial contempt of court[25] against Fetzer for intentionally violating the protective order by providing a copy of the video deposition of Pozner delineated "confidential" by Pozner to an individual who was not allowed to receive the video under the terms of the protective order. An evidentiary hearing was held on Pozner's motion.

¶60 At the hearing, Fetzer's counsel admitted that Fetzer had violated the protective order by forwarding a copy of the videotape of Pozner's discovery deposition to individuals not authorized to see it. Fetzer testified to the following at the hearing:

- Fetzer admitted that he gave a copy of Pozner's video deposition to Alison Maynard, and Fetzer gave Maynard permission to provide that videotape to Wolfgang Halbig.

---

[25] WISCONSIN STAT. § 785.03(1)(a) describes the procedure a circuit court uses in a nonsummary remedial contempt proceeding, and those procedures will be discussed later in this opinion.

- Fetzer acknowledged at the evidentiary hearing that, during a Skype exchange with Dave Gahary, an associate member of Wrongs Without Wremedies, Gahary asked if Fetzer had provided the videotape deposition to Halbig. Fetzer admitted that he had, and Fetzer stated during their exchange: "What are they going to do? Sue me for a million dollars? Oh, I forgot, they're already doing that."

- Like Fetzer, Halbig professes the belief that the Sandy Hook shooting is an elaborate hoax, and Halbig professes doubts that Pozner is actually Leonard Pozner.

¶61    Pozner had previously sued Halbig for invasion of privacy for allegedly publishing private information about Pozner. In its written decision denying Fetzer's post-verdict motions, the circuit court described the significance of Fetzer allowing Halbig to receive the video of Pozner's discovery deposition:

> In the lawsuit against Halbig, Pozner dismissed his case rather than sit for a video tape deposition. Fearing for himself and his family, … Pozner gave up on his legal claim [against Halbig], rather than to allow his image to be captured and disseminated. Dr. Fetzer did what Halbig could not do. Dr. Fetzer obtained Pozner's image and he disseminated it. This single act created, in Pozner's opinion, an unwarranted and serious risk to his and his family's personal safety…. Pozner, a man who for his own safety moved from place to place now had his picture in the hands of the people he believed would do him harm…. According to Dr. Fetzer, Halbig took Leonard Pozner's image and disseminated it to other parents and apparently to the FBI, presumably in Halbig's similar pursuit [of] their claim that Leonard Pozner is a fraud. According to Pozner, if these people actually believed he was a crisis actor and a fraud and not the same person holding his murdered child, what else are they capable of doing to him[?]

(Internal citation omitted.)

32

¶62    The circuit court made the following findings at the evidentiary hearing:  Fetzer intentionally violated the court's protective order, and Fetzer's contempt of court was "ongoing" in that the video tape deposition of Pozner continued to be distributed to third parties.  The circuit court ordered Fetzer to reimburse Pozner for costs related to the contempt action, sentenced Fetzer to five days in jail (which was stayed pending payment of the imposed sanction), and required Fetzer to "retrieve" the videotape unlawfully distributed or make "sufficient assurances to the best of [his] ability that [the videotape in possession of the individuals] ha[s] [been] destroyed."  Additionally, and material to this issue, the circuit court stated that it would allow evidence of this intentional violation of the court's order to be considered by the jury on the issue of punitive damages.

¶63    Prior to trial, Pozner withdrew his claim for punitive damages, leaving only his claim for compensatory damages.  Also prior to trial, Fetzer's counsel objected to any reference before the jury to Fetzer's violation of the protective order on the grounds that such evidence is not relevant to the issue of Pozner's compensatory damages and is prejudicial.  The circuit court overruled Fetzer's objection.  Fetzer's counsel acknowledged that Fetzer had been unable to retrieve all images taken from the video of Pozner's deposition that had been disseminated as a result of Fetzer's violation.  So, the court agreed with Pozner that the evidence of Fetzer's violation of the protective order was relevant because Pozner's harm from that violation was "ongoing" and that the dissemination of Pozner's video deposition provided an additional source of "conspiracy" "material" for those who believe that Pozner fabricated N.'s murder.  The circuit court cautioned counsel, however, against using the word "contempt" when referring to Fetzer's conduct.

¶64    At trial, Fetzer's violation of the confidentiality order was referred to three times. During opening statements, Pozner's counsel stated: "Fetzer is … going to agree and admit that he's violated this Court's order on confidentiality in e-mailing out videos taken in this case."

¶65    Next, Fetzer was cross-examined by Pozner's attorney as follows.

> [Counsel:] And you're a party to this litigation, so in that role you agreed to a confidentiality order, didn't you? "Yes" or "no"?
>
> [Fetzer:] Several.
>
> [Counsel:] And that means that you agreed that some of the things you learn in this case are confidential, correct?
>
> [Fetzer:] Yes.
>
> [Counsel:] And you agreed that if you thought something labelled confidential was not actually confidential, you'd ask the Court about that, didn't you?
>
> [Fetzer:] I believe that's correct. Yes.
>
> [Counsel:] And you violated that confidentiality order, didn't you?
>
> [Fetzer:] I did.
>
> [Counsel:] You attended Mr. Pozner's deposition?
>
> [Fetzer:] Yes.
>
> [Counsel:] And it was marked confidential, wasn't it?
>
> [Fetzer:] Yes.
>
> [Counsel:] And in violation of this Court's order, you shared that video with others, didn't you? "Yes" or "no"?
>
> [Fetzer:] Yes. Yes.

34

> [Counsel:] And allowing other Sandy Hook hoaxers to spread Mr. Pozner's image, correct? "Yes" or "no"?
>
> [Fetzer:] Yes.

¶66 Later, during closing arguments, Pozner's trial counsel referred to Fetzer's violation of the confidentiality order as follows:

> He testified to you today he promised to follow the protective order of this Court, the laws of this country. He violated it. He told you right from the stand. Yep. He took that deposition clip. He knew it was confidential, and what did he do? He spread that around too in violation of this Court's order.

## C. Analysis.

¶67 Fetzer argues that the circuit court erred in permitting Pozner to elicit testimony and to argue to the jury concerning Fetzer's intentional violation of the protective order. More particularly, Fetzer contends that evidence and argument concerning Fetzer's violation of that order was inadmissible evidence of his "character,"[26] and introduction of such evidence was "prejudicial" to Fetzer. Pozner responds that Fetzer is not entitled to a new trial because admission of that evidence was proper and, in any event, introduction of the evidence and argument from counsel did not affect Fetzer's "substantial rights." We reject Fetzer's

___

[26] Although Fetzer does not cite to WIS. STAT. § 904.04(1) in briefing in this court, that rule of evidence states: "Evidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion…." We also note that § 904.04(2)(a) states in pertinent part:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

argument because, even if we would conclude that the circuit court erroneously admitted this evidence (and we do not so conclude),[27] any purported error was harmless in these circumstances.

¶68    "We may not reverse or order a new trial on the ground of improper admission of evidence unless the error has affected substantial rights of the party seeking relief on appeal." ***Heggy v. Grutzner***, 156 Wis. 2d 186, 196, 456 N.W.2d 845 (Ct. App. 1990); *see* WIS. STAT. § 901.03(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). "For an error 'to affect the substantial rights' of a party, there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue." ***Martindale v. Ripp***, 2001 WI 113, ¶32, 246 Wis. 2d 67, 629 N.W.2d 698 (quoting ***State v. Dyess***, 124 Wis. 2d 525, 543, 547, 370

---

[27] In its written decision on Fetzer's post-verdict motions, the circuit court further explained its reasoning for allowing the admission of this evidence on the issue of compensatory damages:

> Additionally, the court advised the parties that Dr. Fetzer's intentional violation of the court's order and its resulting harm to plaintiff could be presented to the jury, not as a punitive sanction, but because Mr. Pozner convinced this court that the entire episode was a current manifestation of the underlying action taken by the defendant relating to Dr. Fetzer's prior defamatory statements…. This court relied on the fact that Dr. Fetzer's contemptuous act was relevant to the ongoing emotional harm Pozner claimed he was suffering.

> ….

> … Pozner was looking [to] submit evidence of the ongoing harm he faced from Dr. Fetzer's continuing actions, which included sharing and using confidential materials in this case to repeat the claim that Pozner was not a real person. As such, evidence of the contempt order was not character—let alone inadmissible character—evidence.

N.W.2d 222 (1985)) (applying the harmless error test to civil cases). To determine whether a reasonable possibility exists that the error contributed to the result, we examine the evidence brought out at trial. "[W]e have previously held that in determining the necessity for a new trial due to the admission of prejudicial evidence, the effect of the inadmissible evidence should be weighed against the totality of the sufficient credible evidence supporting the verdict." *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.*, 121 Wis. 2d 338, 377, 360 N.W.2d 2 (1984). Our review of this question is de novo. *See Weborg v. Jenny*, 2012 WI 67 ¶43, 341 Wis. 2d 668, 816 N.W.2d 191.

¶69    Pozner sought damages because Fetzer's defamatory statements caused Pozner reputational and emotional harm.[28] Pertinent to our review, Pozner testified to the following.

- Following N.'s murder, Pozner was diagnosed with post-traumatic stress disorder (PTSD). Pozner and his family "started a life

---

[28] For context, we note the material portions of the instruction given to the jury by the circuit court in this case:

> A person wronged by a defamatory statement is entitled to recover money damages. The measure of recovery is such sum as will compensate the person for the damages suffered as a result of the statements.

> In arriving at your answer, you should consider whether Mr. Pozner has suffered any humiliation, mental anguish, physical injury, and damage to his reputation in the community where his reputation is known. You should presume that Mr. Pozner had a good reputation at the time the statements were published. However, in determining damages, you should consider all evidence that has been offered bearing on his reputation in the community.

elsewhere" and, in the year following N.'s murder, Pozner "start[ed] to feel better."

- In mid-2014, Pozner became aware that Fetzer was writing about Pozner and N. and read the defamatory statements. Those statements made Pozner feel "like [he] needed to defend [N.] … to be his voice," Fetzer's statements caused Pozner "duress" and have left him "concerned … for [his] safety, [his] family's safety."

- After publishing N.'s death certificate on N.'s memorial page, Pozner "was accused of being a fake and a fraud" and now, when he thinks of N., "instead of thinking about [N.] and remembering memories that I have with him, I am constantly reminded of all this hate directed at [N.] and me."

- Fetzer's statements "cause[] people to believe … that [Pozner] lied about [his] son's death, that [his] son didn't die" and that as a result of Fetzer's statements, Pozner is "very cautious" when he interacts with people and "very careful about what [he] reveal[s] and what others may reveal about [him]" because "people could accuse [him] of being … this villain that Mr. Fetzer portrayed [him] to be."

- A woman named Lucy Richards accused Pozner of faking N.'s death or hiding N., and made death threats against him for which she was sentenced to prison. The FBI informed Pozner that Richards' "source of information was Mr. Fetzer," and a part of Richards' sentence and release conditions is a prohibition against reading Fetzer's website or any of his material.

¶70    Pozner also presented the deposition testimony of Dr. Roy Lubit, a board certified psychiatrist who has published regarding the issue of trauma, including PTSD in adults.  Lubit testified as follows regarding Pozner:

> [Pozner] is very uncomfortable going out because he has been threatened.…  He is very concerned about people recognizing him … because people come up and approach him and say things, and argue with him, and tell him he's a terrible person, that he is part of this hoax.  That there was no shooting there … that … he's part of this conspiracy to take away their guns, and he made this up.
>
> … [Pozner has] withdrawn from people, he tries not to go out much more than he needs to ….
>
> ….
>
> And [Pozner] said that … 14 months, very roughly, 15 months after [the Sandy Hook shooting] happened he was doing better, he was on the mend [although] people never fully get over these things….
>
> ….
>
> But then he started going downhill … when there were attacks on him, verbally, that he's making up a hoax, … there never was a son, his son wasn't killed … and people started harassing him in various ways….

¶71    Lubit opined that Pozner continued to suffer from PTSD as a direct result of being "publicly accused of having falsely claimed he lost a child."  Lubit further testified that "if people just left him alone, he would not now be suffering from PTSD.  So as a result of what they did, his trauma symptoms not only ceased to heal, but got worse."

¶72    We reject Fetzer's characterization of the above-mentioned evidence as "weak[]" as compared to the evidence regarding Fetzer's intentional violation of the protective order.  The testimony outlined above establishes that Pozner began to heal from the trauma of his son's death, but that the defamatory

statements made by Fetzer have resulted in a regression in Pozner's healing process and have caused him continuing emotional harm. When the above-cited evidence is weighed against the very brief testimony that Fetzer violated the court's confidentiality order and counsel's truncated argument to that effect, we are confident that there is no reasonable possibility that references to Fetzer's violation of the protective order contributed to the jury's verdict and affected the substantial rights of Fetzer. *See Martindale*, 246 Wis. 2d 67, ¶32.

### III. Fetzer's Motion For a New Trial Based on "Incitement" of Third Parties.

¶73    Fetzer argued in his post-verdict motions that he is entitled to a new trial on the issue of damages for a second reason. Fetzer's briefing on this issue jumbles together various concepts. As best we can tell, Fetzer's argument is that the jury's answer to the special verdict question improperly caused him to be liable to Pozner for damages that Pozner sustained from what Fetzer refers to as "incitement"[29] of third parties who read Fetzer's defamatory statements.

¶74    As previously noted, Pozner testified at trial that Fetzer's defamatory statements "cause[] people to believe … that I lied about my son's death," Pozner is "very cautious" interacting with people because "it constantly happens" that people make accusations about him "being this villain that Mr. Fetzer portrayed me to be." As noted, a woman made death threats against Pozner because she thought that he was "faking [his] son's death or hiding [his] son," and that woman told the FBI that her "source of information was Mr. Fetzer."

---

[29] The term "incitement" is defined as "the act of encouraging someone to do or feel something unpleasant or violent." Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/incitement (last visited Mar. 12, 2021).

¶75     Fetzer's motion was denied by the circuit court, and we reject Fetzer's argument for the following reasons.[30]

### A.  The Evidence Concerned Pozner's Reputation.

¶76     Pozner contends that the evidence Fetzer now complains of post-trial comes within the damages allowable for defamatory statements.  *See **Denny***, 106 Wis. 2d at 643 (defining defamatory statements as a statement "that 'tends so to harm the reputation of another so as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her]'" (quoting ***Westby v. Madison Newspapers, Inc.***, 81 Wis. 2d 1, 6, 259 N.W.2d 691 (1997))).[31]     Pozner argues that harm to reputation necessarily encompasses at least some evidence of what others think and say about a defamed plaintiff.  Other than referring to it as "semantics," Fetzer does not engage with Pozner's argument.

---

[30] Fetzer makes a number of factual assertions in the argument sections of his briefs in this court about incitement of third parties but, with the exception of a single citation to Pozner's attorney's closing argument, he fails to cite to any portion of the record to support his position.  In his reply brief, Fetzer in an obscure manner refers to facts purportedly cited in his brief-in-chief.  However, we are left to wonder what evidence in the record Fetzer might be relying on.  We could reject Fetzer's argument regarding purported incitement of third parties for this reason but, instead, we consider the arguments of the parties.  *See* WIS. STAT. RULE 809.19(1)(e); *see* ***Grothe***, 239 Wis. 2d 406, ¶6 (declining to address arguments not supported by citations to the record).

[31] To repeat, pertinent portions of the instruction read to the jury by the circuit court were:

> In arriving at your answer, you should consider whether Mr. Pozner has suffered any humiliation, mental anguish, physical injury, and damage to his reputation in the community where his reputation is known….  However, in determining damages, you should consider all evidence that has been offered bearing on his reputation in the community.

¶77    Fetzer's argument assumes that negative interactions of persons with Pozner must concern only "incitement" of third parties.  We reject that assumption because the evidence Fetzer now complains of was relevant to the issue of whether the defamatory statements affected how others view Pozner.  Pozner presented evidence of how his reputation was affected by Fetzer's statements; in other words, how people viewed him when those persons were made aware of Fetzer's defamatory statements.  We agree with Pozner that, as a matter of expedience, the actions and statements of others are relevant to the perception of Pozner in the community and whether his reputation was lowered.  That reputation evidence helped establish how the public views Pozner in light of Fetzer's defamatory statements, and it was properly part of the damages consideration for the jury.

## B. Forfeiture.

¶78    Fetzer argues that evidence at trial violated Wisconsin public policy because, in allowing recovery for purported incitement of third parties by Fetzer, there is "no sensible or just stopping point; [it] would place too unreasonable a burden on the speaker; would be wholly out of proportion to the culpability of the speaker; and would be too remote from the speaker's own actions."[32]

---

[32] The Wisconsin Supreme Court has considered six public policy grounds upon which Wisconsin courts may deny liability in tort cases, including:  (1) the injury is too remote from the wrongful act; (2) the recovery is wholly out of proportion to the culpability of the tortfeasor; (3) the harm caused is highly extraordinary given the wrongful act; (4) recovery would place too unreasonable a burden on the tortfeasor; (5) recovery would be too likely to open the way to fraudulent claims; and (6) recovery would enter into a field that has no sensible or just stopping point. *Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶49, 313 Wis. 2d 294, 752 N.W.2d 862.

42

¶79    Fetzer also makes a separate argument that allowing the jury to hear and rely on "incitement" evidence violates his First Amendment rights unless the test in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), is satisfied:

> [T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

*Id.* at 447.

¶80    Pozner contends that Fetzer forfeited these arguments.[33]  In support of that position, Pozner asserts that his complaint does not state a separate cause of action for incitement of others.  Fetzer concedes that no such cause of action was pled by Pozner when he states in briefing in this court:  "Incitement, moreover, is unrelated to reputational injury, which is [Pozner's] only ostensible basis of recovery."  Pozner asserts that, if we assume that the evidence Fetzer now

---

[33] Before considering Pozner's contention that Fetzer forfeited these arguments, we pause to consider whether Fetzer ties his contentions that Wisconsin public policy and his First Amendment rights were violated to the facts of this case.  His briefing in this court shows that Fetzer gives only the following conclusory statements with no analysis in support of those positions:  "Pozner essentially would impose strict liability whenever a third person reads something and then commits acts of lawlessness," "[c]asual [sic] liability for the uninvited actions of the readers of speech is a dangerous precedent," and "[s]peech, and its public policy implications is not an abstract aspiration.  The limits on liability for alleged incitement are fundamental to an informed and intellectually vibrant society."  Those generalized, conclusory assertions do not substitute for analysis germane to this issue and the facts of this case.  Without a developed argument, we need not consider Fetzer's assertions.  *Associates Fin. Servs.*, 258 Wis. 2d 915, ¶4 n.3 (declining to address undeveloped arguments).  However, for the sake of completeness, we consider other arguments of the parties.

In addition, in his post-verdict motions in the circuit court and in his brief-in-chief in this court, Fetzer argued that there was insufficient evidence to support any claim for incitement of third parties in this action.  Fetzer abandons an insufficiency of the evidence argument in his reply brief in this court, in which he states:  "The issue raised is not one of … sufficiency of the evidence, but rather constitutional mandate and public policy."

complains of concerned incitement of third parties rather than Pozner's reputation, it necessarily follows that evidence and argument concerning incitement of third parties was not properly a part of Pozner's claim for defamation damages, and Fetzer was required to object to the jury's consideration of that question. As we now discuss, Fetzer made no such objection or argument at or before trial and, therefore, Fetzer's arguments were forfeited and further we decline to address those.

¶81 The Wisconsin Supreme Court in *State v. Mercado*, 2021 WI 2, 395 Wis. 2d 296, 953 N.W.2d 337, has described the proper application of the forfeiture rule:

> Forfeiture occurs when a party fails to raise an objection. We have espoused important reasons why courts should abide by the forfeiture rule. Those rules include, for example, allowing circuit courts to correct errors in the first instance, providing circuit courts and parties with fair notice of an error and an opportunity to object, and preventing "attorneys from 'sandbagging' errors" by not raising them during trial and alleging reversible error upon review.

*Id.*, ¶35 (footnote omitted) (internal citation omitted) (quoting *Huebner*, 235 Wis. 2d 486, ¶12).

¶82 Pozner contends, and Fetzer does not dispute, that Fetzer never raised an objection at or before trial to the admission of evidence regarding statements made to Pozner by persons other than Fetzer that were caused by Fetzer's defamatory statements. Material to that point, our supreme court has stated:

> In the context of admitting or denying admission of evidence, forfeiture is contemplated by statute. WISCONSIN STAT. § 901.03(1) provides that, "Error may not be predicated upon a ruling which admits or excludes evidence

> unless a substantial right of a party is affected and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record ...." Two things are required before an appellate court may reverse evidentiary errors: (1) the violation of a party's substantial right and (2) an objection or motion to strike.

*Id.*, ¶36 (footnote omitted).[34]  As a result, Fetzer has forfeited any objection on appeal to the jury's consideration of this evidence.  *See id.*, ¶38 ("Upon a review of the record, we cannot identify a single instance during the trial in which Mercado objected to [particular evidence]; he therefore forfeited his objection in regard to its admissibility.").  Further, we see no good reason to overlook forfeiture in these circumstances.

¶83    Next, Pozner contends that Fetzer forfeited any argument on appeal regarding the jury instructions.  That contention is germane because Fetzer argues on appeal that the circuit court should have instructed the jury that it could not impose damages against Fetzer for statements of others allegedly incited by the defamatory statements unless the jury found that the standards enunciated in *Brandenburg*, 395 U.S. at 447, were satisfied by the evidence.  Fetzer argues in this court that this issue must be met "head on."  That statement from Fetzer is ironic because Pozner contends, and Fetzer does not dispute, that Fetzer did not request a jury instruction regarding the standard discussed in *Brandenburg*.  By failing to do so, Fetzer has forfeited the argument.  *See* WIS. STAT. § 805.13(3) ("Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict."); *see Best Price Plumbing, Inc. v. Erie Ins. Exch.*, 2012 WI 44, ¶39, 340 Wis. 2d 307, 814 N.W.2d 419 (stating that failure to

---

[34] Fetzer does not contend that any exceptions to the statutory mandate discussed by the supreme court in *State v. Mercado*, 2021 WI 2, ¶37, 395 Wis. 2d 296, 953 N.W.2d 337, are applicable.

object at the jury instruction conference constitutes forfeiture of an objection to a jury instruction).

¶84 Finally regarding forfeiture, the relief requested by Fetzer for these alleged errors is a new trial on all damages issues. Fetzer asks for a new trial on all damages issues because, according to him, the evidence about the purportedly "incited" statements of third parties "cannot be parsed out as contributing to the jury's verdict." But, for the reasons we next discuss, Fetzer has forfeited that request for a new trial because of his failures to make the necessary objections and requests at trial.

¶85 The circuit court concluded in its post-verdict decision, and we agree, that "Pozner's claim for compensatory damages did not rest entirely" on statements made by others. That is to say, Pozner did not base his damages claim solely on statements of others caused by Fetzer's defamatory statements. Instead, Pozner's claim for compensatory damages was premised mostly on the basis that the defamatory statements themselves caused Pozner direct harm. As one example previously noted, Pozner presented evidence in the form of expert testimony from Dr. Lubit that Fetzer's defamatory statements in themselves have prevented Pozner from healing from the PTSD Pozner suffered following N.'s murder. Pozner also testified that he changed his behavior in a negative manner as a result of the defamatory statements.

¶86 As stated, Fetzer does not argue that this evidence of damages which had nothing to do with the purported "incitement" of others evidence was not sufficient to support a damages award. But, because of strategic decisions or failures to act on Fetzer's part at or before trial, there is no remedy at this point other than a new trial on all damages issues to parse out the evidence Fetzer now

claims post-trial that the jury should not have considered. Because of Fetzer's strategic decisions or failures to act, the circuit court was not given the opportunity to frame the jury instructions or questions in the special verdict to ensure that there was a proper record to decide post-trial questions of public policy or constitutionality which Fetzer should have raised prior to or at trial. As a result, we cannot know how much weight, if any, was given to this evidence in deliberations by the jury or how much of the damages verdict, if any, concerned the evidence to which Fetzer now objects. Fetzer cannot, by his failure to act at or before trial, cause the record to be unclear, and then rely on that lack of clarity to obtain a new trial on all damages issues.

¶87    In sum, we reject Fetzer's request for a new trial on damages based on his public policy and constitutionality arguments.

## IV.  APPEAL IN 20AP1570.

### A.  Fetzer's Second Contempt of Court.

¶88    Fetzer argues that the circuit court's alternative purge condition for the second contempt finding, an order for payment of $650,000 reflecting a portion of Pozner's attorney fees incurred in this action, is in error. We reject Fetzer's argument for the following reasons. We begin by considering additional pertinent facts.

### 1. Additional Pertinent Facts.

¶89    About two weeks after the circuit court first found Fetzer in contempt of court for distribution of Pozner's deposition, Fetzer provided a copy of Pozner's deposition again to Maynard. Months after that, Pozner discovered that Maynard published a blog post that included a link to a copy of Pozner's

videotaped deposition and deposition transcript. Based on that information, Pozner again asked the circuit court to hold Fetzer in contempt of court.

¶90 At the second contempt hearing, Fetzer's counsel admitted that Fetzer provided Maynard with a copy of Pozner's deposition for a second time. Put another way, Fetzer violated the protective order a second time after he was told by the court at the first contempt hearing that Maynard was not authorized to receive materials protected by that order.

¶91 The circuit court found, for a second time, that Fetzer was in contempt of court.[35] Of importance, the circuit court also found that Fetzer's contempt was continuing in that all copies of the deposition that had been unlawfully disseminated were not recovered. In fact, Fetzer conceded the continuing contempt finding of the circuit court:

> [THE COURT:] Having so held him in contempt, now for the second time, do you agree, [counsel for Fetzer], that the contempt is continuing? Now, I understand that factually, you suggested that Ms. Maynard is -- I think the words that you used at one point in the courtroom, stuff the genie back in the bottle, perhaps.
>
> But do you also agree that the deposition transcript has been disseminated more widely and will never be assuredly removed from the possession of those that are not authorized?
>
> [FETZER'S COUNSEL]: I don't disagree with that, Your Honor.
>
> THE COURT: All right.

---

[35] A circuit court's finding of contempt is reviewed under an erroneous exercise of discretion standard. *See Frisch v. Henrichs*, 2007 WI 102, ¶29 n.13, 304 Wis. 2d 1, 736 N.W.2d 85. Here, Fetzer does not dispute that the contempt finding was appropriate.

48

> So having found that the contempt is continuing, the purpose of the hearing is to fashion a remedy to address continuing contempt.

¶92    Further, Fetzer does not challenge on appeal the circuit court's finding that his contempt was continuing and does not in reply dispute Pozner's assertion in his brief-in-chief that Fetzer's second contempt of court is ongoing. *See **Schlieper v. DNR***, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (stating propositions asserted by a respondent and not disputed by the appellant's reply are taken as admitted).  Accordingly, we conclude that there is no dispute that Fetzer's second contempt of the circuit court's order was continuing.  Fetzer further does not question that Pozner incurred in this litigation at least $650,000 of attorney fees or that the fees were reasonably incurred.

## 2.  The Order Was For Remedial Contempt.

¶93    The parties disagree on whether the circuit court imposed remedial or punitive contempt.  Determining whether the contempt sanction was punitive or remedial is a question of law that this court reviews de novo.  *See, e.g.*, ***Diane K.J. v. James L.J.***, 196 Wis. 2d 964, 968, 539 N.W.2d 703 (Ct. App. 1995).

¶94    As applied to these circumstances, "'[c]ontempt of court' means intentional … [d]isobedience, resistance or obstruction of the authority, process or order of a court." WIS. STAT. § 785.01(1)(b).  "Contempt may be punished either by a punitive sanction or a remedial sanction." ***Frisch v. Henrichs***, 2007 WI 102, ¶33, 304 Wis. 2d 1, 736 N.W.2d 85; *see also* WIS. STAT. §§ 785.02 and 785.04(1) and (2).  The ***Frisch*** court stated:

> A punitive sanction is "imposed to punish a past contempt of court for the purpose of upholding the authority of the court." WIS. STAT. § 785.01(2).  "A court issuing a punitive sanction is not specifically concerned with the private interests of a litigant." ***Diane K.J. v.***

> *James L.J.*, 196 Wis. 2d 964, 969, 539 N.W.2d 703 (Ct. App. 1995). A punitive sanction requires that a district attorney, attorney general, or special prosecutor formally prosecute the matter by filing a complaint and following the procedures set out in the criminal code. WIS. STAT. § 785.03(1)(b).

*Frisch*, 304 Wis. 2d 1, ¶34. "[B]ecause the sanction is directed only at past conduct, its imposition cannot directly aid a litigant harmed by the contempt." *Christensen v. Sullivan*, 2009 WI 87, ¶52, 320 Wis. 2d 76, 768 N.W.2d 798 (quoted source omitted).

¶95     In contrast, a remedial sanction is one that is "imposed for the *purpose of terminating a continuing contempt of court*." WIS. STAT. § 785.01(3) (emphasis added). "[T]his means that remedial sanctions may be imposed *only* when action or inaction constituting contempt of court is ongoing and needs to be terminated." *Christensen*, 320 Wis. 2d 76, ¶54.

¶96     The circuit court concluded that it was imposing a remedial contempt sanction. We agree. The contempt request was not prosecuted as required under WIS. STAT. § 785.03(1)(b), and there is no dispute that Fetzer's contempt was continuing.

### 3. Sanction Related to Fetzer's Contempt.

¶97     The parties next dispute whether the second contempt order remedies were reasonably related to Fetzer's contempt. The issue of whether a circuit court has authority under WIS. STAT. ch. 785 to employ remedial contempt requires interpretation and application of a statute, and that is a question of law this court reviews de novo. *Frisch*, 304 Wis. 2d 1, ¶29.

¶98 "A person aggrieved by another person's contempt may file a motion for imposition of a remedial sanction for the contempt, and the court may impose an authorized sanction." *Id.*, ¶35.[36] The circuit court found that there may be future contemptuous acts by Fetzer based on his past behavior and other actions (as we described above in ¶60). Future compliance with a court order is an acceptable purpose for a remedial sanction. *See Benn v. Benn*, 230 Wis. 2d 301, 309, 602 N.W.2d 65 (Ct. App. 1999).

¶99 As our supreme court explained in *Frisch*:

> At one time, the statutes required that civil contempt situations be purgeable. *See* [WIS. STAT. §] 295.02(4) [1974-75]. *The current statutes do not contain such a requirement* other than the provision that a person may be imprisoned for civil contempt "only so long as the person is committing the contempt of court or 6

---

[36] The following remedial sanctions may be imposed by the circuit court for the purpose of terminating a continuing contempt of court:

> (a) Payment of a sum of money sufficient to compensate a party for a loss or injury suffered by the party as the result of a contempt of court.
>
> (b) Imprisonment if the contempt of court is of a type included in [WIS. STAT. §] 785.01(1)(b), (bm), (c) or (d). The imprisonment may extend only so long as the person is committing the contempt of court or 6 months, whichever is the shorter period.
>
> (c) A forfeiture not to exceed $2,000 for each day the contempt of court continues.
>
> (d) An order designed to ensure compliance with a prior order of the court.
>
> (e) A sanction other than the sanctions specified in pars. (a) to (d) if it expressly finds that those sanctions would be ineffectual to terminate a continuing contempt of court.

WIS. STAT. § 785.04(1).

months, whichever is the shorter period." [WIS. STAT.
§] 785.04(1)(b).

*Frisch*, 304 Wis. 2d 1, ¶58 (quoting *Larsen v. Larsen*, 165 Wis. 2d 679, 685 n.1, 478 N.W.2d 18 (1992)). Instead, WIS. STAT. ch. 785 "has been consistently interpreted to allow the circuit court to establish an alternative purge condition to purge a party's contempt." *Id.*, ¶60. "An alternative 'purge condition' may be [a] sanction authorized under WIS. STAT. § 785.04(1)(a) or (e).'" *Id.* "The contempt statute allows the purge condition and the sanction to be the same." *Id.*, ¶63. An ongoing contempt can be terminated by complying with the alternative purge condition. *Id.*, ¶60.

¶100 The circuit court determined that the sanctions set forth in WIS. STAT. § 785.04(1)(a)-(d) would be ineffectual to terminate Fetzer's continuing contempt, and that the sole proper remedy lay within § 785.04(1)(e). In imposing an alternative purge condition against Fetzer under that statutory provision, the court stated:

> [Pozner] has met [his] burden and established a nexus between the requests for reimbursement of the fees and the contempt that the Court has found to be current, ongoing, and not likely to be terminated any time soon.
>
> So therefore, I'm going to grant the plaintiff's motion and issue an award, issue a judgment for actual attorneys' fees incurred on two alternative theories. One is simply as it relates to the contempt and the connection between the fees expended since commencement of this action, but also just taking the total amount as being an … appropriate sanction … independent of that nexus, to be an appropriate consequence for … Dr. Fetzer's repeated contemptuous behavior.

¶101 Fetzer argues that the alternative purge condition set by the circuit court of $650,000, which reflects a partial payment toward Pozner's attorney fees incurred in this action, is improper. But, the circuit court was left, at Fetzer's

specific request, with only monetary alternative purge conditions because Fetzer asked not to be jailed in light of what Fetzer referred to as his "health conditions."

¶102   The circuit court properly focused on the harassment of Pozner in this action by Fetzer in his continuing contempts in violation of the court's protective order.  We see no reason to question the circuit court's finding that Pozner was worse off at the end of the proceedings in the circuit court than he would have been if he had never brought suit, at least in terms of his image and information being disseminated on the internet to Pozner's detriment.  As Pozner asserts, Fetzer, despite a court order designed to protect Pozner's image and confidential information, took the affirmative steps of gathering non-public information and disseminating it on the internet to persons who have professed beliefs similar to his regarding the Sandy Hook shooting.  And, as Pozner asserts, Fetzer used these legal proceedings to obtain information and Pozner's image, which Fetzer could not obtain otherwise, to harass and "publicly smear" Pozner. It was reasonable for the circuit court to award a substantial share of the attorney fees incurred by Fetzer in this action because of the multiple and intentional violations of the protective order, the harm to Pozner, the continuing nature of the contempt, and the likelihood of future contemptuous actions by Fetzer.  That the circuit court may have employed a different alternative purge condition does not lead to the conclusion that the circuit court did not have the authority to employ this condition or that the circuit court's order is improper.

### 4.  Evidentiary Hearing.

¶103 Lastly, Fetzer argues that the circuit court erred because it did not give Fetzer an evidentiary hearing regarding his ability to pay the $650,000

alternative purge condition. It is correct, as Fetzer argues, that "the contemnor should be able to fulfill the proposed purge." *See Frisch*, 304 Wis. 2d 1, ¶64.

¶104 The circuit court recognized that this could be an issue and suggested that an evidentiary hearing may be needed. At the next hearing at which the circuit court ruled on this issue, the court specifically asked Fetzer's counsel whether he requested an evidentiary hearing on any issue concerning the second contempt. Fetzer's counsel answered: "Your Honor … my preference would be to proceed as scheduled … with oral arguments rather than an evidentiary hearing." Under those circumstances, Fetzer waived the right to have an evidentiary hearing on this particular issue, and cannot be heard to complain of the circuit court's failure to hold such an evidentiary hearing when he declined the opportunity.[37]

¶105 In sum, the circuit court did not err in granting the alternative purge condition for Fetzer's second contempt of court.

## B. Alleged Bias of the Circuit Court.

¶106 Finally, Fetzer argues that the circuit court acted with bias against him. We reject this argument for the following reasons.

¶107 When analyzing a claim of judicial bias, we "presume that the judge was fair, impartial, and capable of ignoring any biasing influences." *State v.*

---

[37] Fetzer also argues that Pozner recognized that Fetzer may have difficulty paying a large judgment in this case. However, Fetzer does not make any cognizable argument that Pozner waived or forfeited his right to a contempt remedy by making a general observation about what Fetzer may, or may not, have available to him in terms of money and assets at this time or going forward.

*Gudgeon*, 2006 WI App 143, ¶20, 295 Wis. 2d 189, 720 N.W.2d 114. The burden is on the party asserting judicial bias here, Fetzer, to show bias by a preponderance of the evidence. *State v. Herrmann*, 2015 WI 84, ¶24, 364 Wis. 2d 336, 867 N.W.2d 772. The Wisconsin Supreme Court has stated that "it is the exceptional case with 'extreme facts' which rises to the level of a 'serious risk of actual bias.'" *Miller v. Carroll*, 2020 WI 56, ¶24, 392 Wis. 2d 49, 944 N.W.2d 542 (quoted sources omitted). Fetzer asserts that there is evidence of the circuit court's "objective bias." Objective bias in this context means that a reasonable person could question the court's impartiality based on the court's statements. *See id.*, ¶40. A circuit court's partiality is a matter of law reviewed independently by this court. *State v. Goodson*, 2009 WI App 107, ¶7, 320 Wis. 2d 166, 771 N.W.2d 385.

¶108 As an initial matter, we reject some of Fetzer's claims of the circuit court's bias. Those allegations concern purported acts of the circuit court regarding issues discussed in appeal number 2020AP121, as opposed to appeal number 2020AP1570, the second contempt of court decision appeal just discussed. We did not consolidate these appeals for briefing purposes, and the parties filed separate briefs in each appeal. Claims of bias regarding the circuit's decisions discussed in the earlier appeal were required to be raised within the briefing in that separate appeal, and Fetzer did not do so. Therefore, those claims of bias were forfeited by Fetzer for failing to raise those issues at the proper time, and we decline to overlook that forfeiture.

¶109 In regard to issues concerning the second contempt of court decision of the circuit court, Fetzer raises only the allegation that the circuit court "sua

sponte proposed to award Pozner attorney fees" as a contempt sanction.[38]  We do not find any basis for Fetzer's bias argument.  As pointed out by Pozner, he had requested attorney fees in his complaint.  Moreover, Fetzer does not dispute that, by the time at which attorney fees were discussed, he had not proposed a viable alternative purge condition.  As a result, it is not evidence of objective bias of the circuit court to comment that payment of some of Pozner's attorney fees incurred in this action might be an appropriate sanction for Fetzer's continuing and intentional violation of the court's order under these circumstances.

¶110  For those reasons, there is no basis to conclude that there was objective bias on the part of the circuit court regarding the second contempt of court decision.

¶111  One other matter must be addressed.  We are dismayed regarding assertions about the circuit court in the briefs filed in these appeals by Fetzer's counsel.  Fetzer's counsel appears to believe that he has a license to make unprofessional comments about the circuit court that are not in any way supported by the record.

¶112  The following are illustrative examples in briefing in this court: "The court articulated a rambling theory of liability"; "Finally, the court attempted to cover its tracks by ruling that Fetzer, in fact, was negligent as a matter of law"; "Due process in such circumstances required notice and an opportunity for Fetzer to be meaningfully heard, especially when the court becomes advocate"; "The

---

[38] Fetzer also contends on appeal that there was evidence of objective bias of the circuit court because the court "refused to consider Fetzer's ability to satisfy" the monetary sanction. We have already decided that the circuit court did not err in that regard. Further, we see no evidence of bias there.

circuit court's foray into the negligence issue, as a solo adventurer, also fares poorly as a substantive matter"; "The circuit court improperly acted as judge advocate for" Pozner; "The circuit court's palpable disdain for Fetzer as a conspiracy researcher is not a basis for judicial abnegation of the right to equal and fair treatment under the law"; The circuit court imposed "rogue remedies"; and "The circuit court, nonetheless, led Pozner's counsel, as if by the halter, to conclude that Pozner was now worse off as a result of the deposition disclosure than before he initiated his limited action for defamation." We should not have to observe that baseless attacks on the competence or integrity of a circuit court judge is not a substitute for effective advocacy.

¶113 We expect, and ethical rules require, that counsel who appear before us are zealous advocates for their clients, and of course this includes pointed, supported argument challenging all potential errors made by a court. What this court neither expects nor wants are gratuitous, disrespectful comments from counsel that are not in any way supported by the record and therefore not worthy of an attorney who practices before this court. We admonish Fetzer's counsel not to continue this practice. We also note, however, that we are confident that the result of this appeal would be the same even if counsel had advocated in a more professional manner.

## CONCLUSION

¶114 For the foregoing reasons, the judgment and orders of the circuit court are affirmed.

*By the Court.*—Judgment and orders affirmed.

Not recommended for publication in the official reports.

57